## CONCORD BANK *vs.* GREGG.

14 331
69 588

Contracts entered into on fraudulent representations are voidable, at the election of the party defrauded, as well in regard to real as personal estate.

Where such a contract is rescinded, it is sufficient if the property be returned, within a reasonable time, in *substantially* the same condition in which it was received.

In case of fraud in the sale of real estate, a deed of quitclaim, made six months after the purchase, was *held* within a reasonable time; it not appearing that the fraud was sooner discovered.

Where such a deed was left with the clerk of the court in which an action on the note, given in consideration of the sale and conveyance of the estate, was pending, and notice was given, to the vendor, of the execution and deposit of the deed, it was *held* a sufficient restoration of the property.

A principal is chargeable with the fraudulent act... and declarations of a special agent, done and made for the purpose of effecting a sale, though not commissioned to commit a fraud.

Even where a party could not recover damages against a principal on account of the fraudulent representations of his special agent, he may avail himself of those representations by way of defence to an action on the contract by the principal.

ASSUMPSIT, upon a promissory note for $2000.00, dated February 23, 1841, payable on demand. The writ was dated June 16, 1842.

The defendant pleaded the general issue, and attempted to show a partial failure of consideration, and that the note was obtained by misrepresentation and fraud.

On the note was endorsed, " Feb. 23, 1841. $275."

The note was given as the consideration for a warranty deed from the plaintiff to the defendant, executed and recorded at the date of the note. Said deed conveyed " a certain saw mill and grist mill, situate in Pembroke, in said county of Merrimack, on the easterly side of Suncook river, (so called,) known by the name of the Buck street mills, with the horse shed and mill yard, and all the privileges and appurtenances to the same mills belonging ; also, one piece or parcel of land, situate in said Pembroke, containing one acre, more or less, and bounded easterly by the west bank of

Suncook river, northerly by Samuel Cochran's grist mill yard, westerly and southerly by land of William Knox: all the aforesaid granted premises being the same which were conveyed by John Clark and David Clark to John Richardson, and by said Richardson conveyed to Josiah Rogers, Josiah Rogers, Jr., and Daniel M. Head, by deed dated August 20, 1835, recorded in the Merrimack records, vol. 42, page 260."

The plaintiff derived title from the Messrs. Rogers and Head, by a mortgage dated March 1, 1839, and judgment for foreclosure of the same at the September term, 1841. But it did not appear whether or not possession was ever taken under said judgment. Head, however, quitclaimed to the bank in October, 1841. Said mortgage contained the following proviso: " Said Rogers and Head reserve possession and improvement of the premises, until forfeited by the legal effect of the foregoing condition." While the said mortgagors were in possession, viz., in April, 1840, they leased the said premises to one Austin, for one year ending April 1, 1841. Under this lease one Cochran and one George entered, and remained in possession until the said mills were destroyed by fire, on the 7th day of March, 1841.

It appeared that said Cochran, on the 24th of February, 1841, was notified by the Directors that they had sold to the defendant, and that some words passed about buying the lease under which he held, and that he agreed to give it up, if he got all his timber sawed, before its expiration. At that time he also admitted notice of a demand on the part of the bank for possession of the mills.

The following facts were also in evidence with regard to the water rights, &c., belonging to the premises conveyed to the defendant. More than forty years since there were at these falls of the Suncook three mills, viz., a saw mill on the easterly side, another on the westerly side, and a grist mill on an island between them ; each of which contributed equally to the support of the dam, and was entitled to a

third part of the water, if there was enough for all ; in case of deficiency, however, the grist mill was entitled in preference to the two saw mills. The saw mills were frequently obliged to stop in the summer. The mills continued to be occupied in this manner until within twelve or fifteen years, when the saw mill on the westerly side was removed, and has never been replaced. At some time between December, 1824, and May, 1829, David Clark, who then owned the premises described in the plaintiff's deed to the defendant, erected a grist mill on the easterly side of the stream, which is the grist mill mentioned in said deed, and which has been in constant use since, though always under protest of the owners of the island mill. Said owners notified Messrs. Rogers & Head, while they owned on the east side, to remove their grist mill. They also informed the directors of the bank that the bank had no right to maintain the grist mill, but that the bank's right was confined to one privilege only. This notice was prior to the conveyance to the defendant. In 1835, Samuel Cochran, who then owned the privilege on the west side, leased it to the same persons, (Messrs. Rogers & Head,) who then owned the eastern mill, for a term of ten years, which lease they still hold. The right of the west mill to draw water has never been disputed.

The Messrs. Rogers & Head, from whom the bank took its title, claimed under one Richardson, by deed dated August 20, 1835. Richardson had title through a deed from John and David Clark, dated June 27, 1831. They claimed under a deed from David Clark to themselves and Nathaniel Clark, dated May 20, 1829, and said Nathaniel's subsequent conveyance to John. The title of the last named David Clark came by deed from one Daniel Knox and others, dated Dec. 15, 1824. All these deeds, except that last named, described the premises in substantially the same manner, as "a certain saw mill and grist mill, situate" &c., as in the plaintiff's deed to the defendant, above set forth. The description in the deed from Knox was as follows : "A certain saw

mill, situate in said Pembroke, standing on Suncook river, (so called,) and is known by the name of Buck street mill, and said mill is standing on the easterly side of said river, adjoining on Allenstown, together with all the mill yard on the easterly side of said river, and all the water privileges where said saw mill stands, and which thereunto belongs to said mill privileges."

It appeared that Daniel M. Head, (the same person already mentioned in connection with Messrs. Rogers,) was, in February, 1841, specially employed by the plaintiff to sell the Buck street property, and that it was through his means the defendant was induced to purchase. He represented to the defendant and to the defendant's sons, who were interested in the purchase, that there was "abundant water, as good chance for a grist mill as any where in the county, or that he knew of any where." At another time, he said to them that the bank's " title to the saw mill and grist mill was good, so far as he knew." He accounted for a judgment rendered against the owners of the easterly mill in an action by them against the island owners, for using too much water, on account of a want of preparation, and expressed an opinion that if the case had come to trial, instead of giving them judgment the plaintiffs in that suit would have prevailed. Something was said about there not being a road laid out to the house, and the lease of the western privilege, to which Gregg objected, saying that he "did not wish to buy a law suit."

At the time of the notice to remove the grist mill on the east side, Head had investigated the subject, and concluded beyond a doubt that he and the Messrs. Rogers (who then owned the premises,) would be obliged to remove it. In his interviews with the defendant, however, he did not state that there was any dispute about the right to the grist mill on the east side, but avoided the subject.

It appeared that Head did not communicate to the bank, or any of its officers, the representations he had made to the

defendant; but it appeared that in January or February, 1841, and before the conveyance to the defendant, one of the island owners told a director of the bank that it had no right to a grist mill on the east side of the river.

The defendant was reluctantly induced to meet the directors, to whom he stated his great aversion to a law suit; and that, although he had come over with an intention to purchase, he was dissatisfied with there being a lease, and about the west privilege, and the want of a road to the house, and had concluded not to .purchase. One of them replied that said privilege and lease was good for nothing, and there should be no trouble about the road. The defendant said that he was a stranger, and did not wish to deceive or be deceived, nor to buy the property, unless he could have it free and clear of all incumbrances, and have immediate possession, with a road opened to the house. The directors replied again that there was nothing in Cochran's title, privilege or lease, and that they would open the road; that the writings might as well be made then, but they would not charge interest until he got possession. After much talk of this character, the writings were made and executed.

The next day, February 24, 1841, the directors met the defendant at the mill, to see about the road and getting possession; but the lessee, as above stated, refused to yield possession, and the directors concluded to wait the election of a new board of selectmen, before doing any thing about the road.

It farther appeared that on March 9th, 1841, the defendant received through the post-office at New Boston, where he resided, a letter from the plaintiff's cashier, as follows:

" Concord Bank, March 6, 1841.

Mr. Joseph Gregg:

D'r Sir,—I am instructed to inform you that Sam'l Cochran, Jr., Esq., and Doct. Renton, (who pretended to have a lease of the Buck street mills,) both agree that you may have immediate possession of said mills, and that

Concord Bank *v.* Gregg.

they have no objection to your becoming occupant without delay. As they were the only ones to hinder, you have full authority to enter under your deed and improve the premises."

On the next day, March 10th, the defendant was informed for the first that the mills had been burned on the previous Sunday.

On the first day of September, 1841, the defendant executed a quitclaim deed to the plaintiff of the lands conveyed to him, as above stated, and left the same with the clerk of the court in which this suit was pending, to be delivered to the plaintiff, of which the clerk immediately notified the cashier.

*Ainsworth,* for the plaintiff. The defendant puts his case upon two grounds:—1. That the consideration has partially failed. But there is no question that the title to the property generally is good. 2. That there were fraudulent representations. But he has seen fit to take and record his deed, and has paid $275 on the note!

Where there has been fraud or false warranty as to personal property, the rule is that the property be returned and the contract rescinded. We find no case where it is applied to real estate, except in 11 *Johns.* 50, *Frisbee* vs. *Hoffnagle,* and there there was a total failure of title. In 7 *Mass.* 14, *Fowler* vs. *Shearer,* and 3 *Pick.* 457, *Knapp* vs. *Lee,* the parties had no remedy on covenants. In 14 *Pick.* 217, *Dickinson* vs. *Hall,* the patent right which was sold in consideration of the note sued, was void. But here the defendant has his remedy on the contract, and must rely on that alone. 2 *Camp.* 346.

As to a partial failure of consideration, see 1 *N. H. Rep.* 174; 1 *Greenl.* 352, *Lloyd* vs. *Jewell;* 15 *Mass.* 171; 3 *Camp.* 38; 14 *East* 486; *Chitty on Bills* 72; *Bayley on Bills* 530–540.

The defendant's attempt to rescind the contract was made

Concord Bank *v.* Gregg.

too late. The quitclaim was six months after the mills were burned. He ought to have put the plaintiff in the same condition he was in at the sale. 15 *Mass.* 319 ; 1 *Met. &* *Perk. Dig.* 127, 590 ; 2 *Johns. Ch. Cases* 23. Leaving the deed with the clerk was no delivery to the plaintiff. It does not appear that the plaintiff had any right to take it away. The defendant had also affirmed the contract by recording his deed. 7 *Greenl.* 70 ; 7 *Pick.* 52.

The evidence as to fraud was not competent evidence for a jury to consider. The plaintiff made no representations except by its agent. He had no authority to sell or to make any representations. The directors acted in good faith. Their statements were only matters of opinion, and to be taken as such. The defendant had been notified of the privilege. Now a principal is not answerable for the fraud of a special agent, like Head. 5 *Maine* 295.

A grantee must inform himself as to title, or rely on his warranty. 1 *Yeates* 307 ; 1 *Met. & Perk. Dig.* 108, § 241 ; 1 *Johns.* 414 ; 5 *Greenl.* 295.

*Pierce & Minot,* for the defendant. Head was a general agent to "effect a sale." The director's reply was material as to quantity of water, which particular is not covered by the warranty. The defendant relied on the representations of these agents of the plaintiff. To allow him to do so with the knowledge he had, was *gross fraud.*

The defendant wanted immediate possession. The statement in the cashier's letter was untrue. The tenants under the lease to Austin held over until after the fire. See 22 *Pick.* 546, *Holbrook* vs. *Burt.*

As to liability of principal for representations of an agent, *Long on Sales* 206 ; 5 *Esp.* 134 ; *Ditto* 72 ; *Story's Agency* 465, § 452 & *n.* 3 ; *Ditto* 466. It makes no difference whether the false representation be effected by a suppression of truth, or an expression of a falsehood. 13 *Peters* 26 ; 2 *Kent's Com.* 482. Here, confidence was reposed. 13 *Wend.*

87 ; 3 *Stark. Ev.* 1626 ; 6 *Tennessee R.* 642 ; *Cowp.* 395 ; 3 *Vesey, Jr.* 625 ; 3 *Stark. Ev.* 1627 ; 1 *Camp.* 337 ; 14 *Vesey, Jr.* 144 ; 3 *Mer.* 704. The contract is void, if a false representation induced in any degree to its execution. 22 *Pick.* 53 ; 11 *Wend.* 557 ; 13 *Wend.* 87, 89 ; 22 *Pick.* 552 ; 2 *Saund.* 528 ; 3 *Starkie* 1627. The presumption is that the vendee did rely upon them.

A vendee may rescind within a reasonable time. 2 *Cowen* 246 ; 5 *East* 449 ; 15 *Mass.* 322 ; 4 *Mass.* 502 ; 17 *Johns.* 439 ; 2 *Kent* 470 ; 1 *Camp.* 190. In the case of *Holbrook* vs. *Burt,* there had been a great change in the property. As to the time for rescinding, see 17 *Maine* 329. Some objection was taken as to the manner of our quitclaiming, but the clerk had authority to deliver the deed.

PARKER, C. J. The principle that contracts obtained through fraudulent representations are voidable at the election of the party thus defrauded, is well settled. 7 *Johns.* 325, *Kettletas* vs. *Fleet ;* 19 *Maine* 281, *Ayers* vs. *Hewett ;* 12 *Pick.* 307, 312, *Rowley* vs. *Bigelow ;* 22 *Pick.* 18, *Thurston* vs. *Blanchard ; Ditto* 546, *Holbrook* vs. *Burt.* And this principle is as well applicable to contracts respecting the sale and conveyance of real as of personal estate. It was applied by this court in the case of *Sanborn* vs. *Osgood,* and also in the case cited in the argument by the plaintiff's counsel, 11 *Johns.* 50, *Frisbee* vs. *Hoffnagle.*

The general principle relative to such cases has been said to be, that the parties must be put in the same situation in which they stood at the time the contract was entered into. See *Long on Sales* 139, (*Rand's Ed.* 242,) *and cases there cited.* But this must be understood to be with reference to the subject matter. If it were true in a strict literal sense, no contract could be rescinded after there had been a change of possession, because the parties could not be put in the same situation in which they were before the contract. The vendor, by the contract, would have lost the possession of

the thing which formed the subject matter, and, perhaps, been thereby deprived of some use of it ; and the vendee having the possession would in most cases have had some advantage from that possession, although perhaps nothing from which, upon the whole, he had derived any pecuniary profit. It is sufficient that the property is returned to the vendor in a reasonable time, and that he is placed substantially *in statu quo.*

We are of opinion that the defendant brings himself within this principle. He received a conveyance of land, mills, &c., February 23d, 1841. He did not file the quitclaim deed with the clerk until the first of September, 1841. But it appeared that Cochran and George (tenants under the lease to Austin,) were in possession, and did not agree to surrender it. A road, too, was to be opened, which was not done. It was also agreed that no interest should be charged until the defendant had the possession. Actual possession he does not appear ever to have had. The mills were burned within a few days after the conveyance, without any agency or fault of the defendant. There is nothing tending to show that they would not have been burned in the same manner, if the conveyance had never been made. The notice that he could have possession was not received until after the mills were burned ; whether it was actually made as of the day on which it is dated, is therefore immaterial.

We cannot say that there was any unreasonable delay in making the reconveyance. For aught that appears, it was done as soon as the fraud was discovered.

We are of opinion, also, that as a suit had been commenced upon the note, it was sufficient to lodge the quitclaim deed with the clerk, and to have notice given to the plaintiff's agent. If no suit had been commenced, it might have been necessary to tender the deed to some agent of the plaintiff. But in *Thurston* vs. *Blanchard,* 22 *Pick.* 18, it was held sufficient that the vendor had the note of the fraudulent

vendee in court, ready to be surrendered, at the time of the trial of the action to recover the value of the goods.

We have no doubt that there was fraud enough in the representations made by Head, to avoid the sale, had he been himself the vendor instead of the agent. But it is contended that Head was a special agent, and that in making these representations he exceeded his authority, and that the plaintiff is not therefore responsible.

It is not quite clear that there is not evidence in the case from which a jury might find that Head had authority to make such representations. One of the directors made declarations to the same effect respecting Cochran's possession, &c., though there is not the same evidence that he had knowledge of their falsity.

We place no great reliance upon this, however, because we are of opinion that, notwithstanding Head was a special agent for the sale, the plaintiff is chargeable with his fraudulent acts and declarations, done and made for the purpose of effecting the sale. Were it otherwise, the principal would never be liable for the frauds of a special agent, unless he commissioned him to commit a fraud. And so with corporations, who must always act by agents. See 10 *N. H. Rep.* 538, *Hatch* vs. *Taylor*.

If, however, it were settled that the principal was not answerable in damages for the fraudulent representations of his special agent, made while conducting the business committed to his agency, that would not relieve the plaintiff from this defence. Even if that were so, the principal could not avail himself of the fraud of the agent, and hold the other party to the contract thus fraudulently procured ; and all the defendant asks here is, that he should be discharged from the contract.

*Judgment for the defendant.*