Rockingham
No. 85-029
No. 86-129

DALE A. DAIGLE

v.

CITY OF PORTSMOUTH

DALE A. DAIGLE

v.

ALBERT PACE

August 6, 1987

562

564

*Bernard J. Robertson*, of Exeter, *Stephen T. Jeffco*, of Portsmouth, and *Stephen D. Mau*, of Rye (*Mr. Robertson, Mr. Jeffco*, and *Mr. Mau* on the brief, and *Mr. Robertson* orally), for the plaintiff.

*Burns, Bryant, Hinchey, Cox & Shea P.A.*, of Dover (*Paul R. Cox, Stephen E. Gaige*, and *Mark H. Gardner* on the brief, and *Mr. Cox* orally), for the defendant City of Portsmouth.

*Ransmeier & Spellman*, of Concord (*Diane L. Perin* on the brief, and *Steven E. Hengen* orally), for the defendant Albert F. Pace.

SOUTER, J. These are appeals taken from two superior court judgments, entered after trials of related actions arising from an assault allegedly committed on the plaintiff by one or more police officers. Gray, J., presided over the first trial, which consolidated actions brought by Dale Daigle against the City of Portsmouth, the Town of Newington and six named police officers employed by those municipalities. This ended with a jury verdict against the City of Portsmouth under the rule of *respondeat superior*, predicated on findings that Portsmouth police officer Albert Pace committed the assault on Daigle while acting within the scope of his employment. Thereafter, a second jury trial was held before Nadeau, J., in an action seeking damages against Albert Pace personally, which resulted in a verdict for the defendant.

In its appeal from the first judgment, the city seeks reversal or other relief because of trial and post-trial errors, and because of the inconsistency of the verdict with the verdict in the second trial. Daigle cross-appeals the court's denial of attorney's fees. In his appeal from the second judgment, Daigle urges reversal on the ground that the principle of collateral estoppel entitled him to judgment against Pace on the issue of liability. We affirm each judgment.

It appears from the record of the first trial that in the early hours of August 12, 1981, two men removed the rear wheels from some cars parked on the lot of Taccetta Chevrolet in Newington. When Newington police officers arrived at the premises, they arrested one of the men, Joseph O'Brien, for attempted theft, but the other thief escaped to a wooded gully behind the Taccetta building. One of the officers, James Trueman, correctly believed that Daigle was the second man and called into the woods demanding his surrender. When Daigle failed to emerge, Trueman radioed for help through the Rockingham County Dispatch Center. Five Portsmouth police officers responded, as did one more from Newington. There was evidence that Albert Pace was among the five from Portsmouth, although he was off-duty at the time in question and his presence at the scene is subject to dispute.

At some point before all the police left, Daigle came out of the woods. While trying to reach his own car, he came upon a Portsmouth officer, who struck him with a night stick. The officer continued to beat Daigle, causing fractures of the skull, black eyes, injuries to the face, neck and right leg, other bruises and contusions, and finally rendering Daigle unconscious. Daigle testified that when he came to, he heard someone say, "He is hurt, hurt pretty bad, you better call an ambulance," to which someone else replied, "F____ him, leave him there, that will teach him a lesson."

After leaving the Taccetta lot, Officer Trueman drove O'Brien into the city of Portsmouth, where he released him without filing any charges. Daigle later made his way to a telephone and called a friend for help. The friend picked him up and later that morning took him to a Dover hospital, from which he was soon transferred to a treatment center for head injuries at the Maine Medical Center in Portland. In the course of his hospitalization, Daigle examined a publication showing photographs of members of the Portsmouth Police Department, from which he concluded that Officer Albert Pace may have been his assailant.

Meanwhile, on the morning of August 12, someone at Taccetta Chevrolet reported wheels missing from certain cars on the lot, prompting an investigation by three Newington officers, Susan Waal, Chief John Stimson and Tom Gordon, the last of whom had responded to the call for assistance the night before. While there was evidence that officer Trueman also stopped at the Taccetta lot after his shift ended, the officer in charge testified that she did not remember seeing Trueman there and was not told by anyone about the events earlier that morning. Despite two Newington officers'

knowledge of those events, and the further evidence obtained during the morning investigation, the Newington police never charged anyone with the attempted theft of the tires.

Daigle was not so quiescent, however, and in June, 1983, he began actions against the City of Portsmouth and Town of Newington. The declarations of his writs allege that one or more unnamed police officers of the respective municipalities assaulted him, negligently used excessive force and negligently allowed others to do the same, for which the municipalities were said to be liable on the theory of *respondeat superior*. The declarations claimed further that the officers had acted under color of State law and in circumstances that rendered the municipalities liable under 42 U.S.C. §§ 1983 and 1985, in connection with which the plaintiff requested an award of counsel fees under 42 U.S.C. § 1988.

In February, 1984, Daigle began a further series of actions claiming personal liability against four named Portsmouth officers, not including Pace, and two from Newington. *Mutatis mutandis*, the declarations track the claims in the earlier actions against the employing municipalities. Although Pace is not named, the allegations of the §§ 1983 and 1985 violations claim that the six named officers acted in concert with each other and with "other police officers as yet unknown."

These two series of actions against the towns and the named police officers were consolidated for trial. In the course of pretrial discovery, Daigle's counsel learned of a written note summarizing an oral report made in 1983 by Portsmouth police officer Robert Hersey to Portsmouth detective George Krook, indicating that Pace had committed the assault. The discovery process itself is the subject of allegations of impropriety; but since these allegations are not ripe for adjudication here, it is sufficient to say that the note led to the commencement of action against Albert Pace personally in August, 1984, based on allegations similar to those against the six other named officers.

Daigle moved to consolidate this last action for trial with the others, to which Pace objected because of insufficient time to prepare for the November, 1984, trial date, which had previously been set in the earlier actions. Counsel for Pace has represented to us that the trial court gave Daigle a choice between consolidating all actions for trial at a later time, or proceeding to try only the earlier series of actions on the date previously set, and that Daigle chose the latter and proceeded to trial. In any case, the court denied the motion to consolidate.

At the close of the plaintiff's evidence against the municipalities and the six officers, the court granted motions to dismiss filed on behalf of Newington and its two named officers. At the close of all evidence, after a six-week trial, the jury returned defendant's verdicts in the actions against the individual officers, but a plaintiff's verdict for $500,000 in Daigle's action against Portsmouth on the theory of *respondeat superior. See* RSA 412:3. This was based on a finding of common-law assault, together with a special finding that Pace had committed the acts. In passing on the related civil rights claim against the city under §§ 1983 and 1985, the jury specially found that Pace had acted under color of State law in committing the assault, but rested its verdict for the defendant city on the further finding that Portsmouth had no "policy, practice or custom, either tacit or express encouraging or condoning police misconduct of the type . . . Pace engaged in." The jurors supplemented their verdicts and special findings with a handwritten note stating their belief that "the four [Portsmouth] officers erred by omission . . . [,] that the true cover up was at a higher level [, that] there was negligence and that Dale Daigle's rights were violated." After verdict, the trial court denied Daigle's motion for counsel fees, and both he and the city filed appeals.

In the remaining action against Pace, Daigle moved for entry of judgment for the plaintiff on the issues of liability and compensatory damages, on a theory of offensive collateral estoppel based on the verdict in the first action. After denial of this motion, a series of further pretrial rulings effectively limited the action to a claim for punitive damages under §§ 1983 and 1985. Trial resulted in a jury verdict for Pace, with a special finding that he had not assaulted Daigle. Daigle appealed. Portsmouth then invoked this special finding that Pace had not committed the assault, as the basis for moving the trial court to vacate the verdict returned in the first trial and to enter judgment in the city's favor. Because this court had already accepted the parties' appeals following the first trial, the superior court had no jurisdiction to entertain such a motion going to the subject matter before us. *See Rautenberg v. Munnis*, 107 N.H. 446, 244 A.2d 232 (1966). The city was, however, given leave to present the claim raised by its motion, as an additional issue in the appeal it had previously filed.

## I.

Our consideration of the two cases begins with their inconsistent verdicts. We will, first, address Daigle's position that under the principle of collateral estoppel the first jury's finding that Pace had

committed the assault entitled Daigle to judgment against Pace on the issue of liability in the later aciton against h.m personally. If Daigle were right, there would no longer be inconsistent verdicts and Portsmouth would have no occasion to press its post-trial motion for judgment notwithstanding the verdict returned against it after the first trial.

At its core, the doctrine of collateral estoppel bars a party to a prior action, or a person in privity with such a party, from relitigating any issue or fact actually litigated and determined in the prior action. *Caouette v. Town of New Ipswich*, 125 N.H. 547, 554–55, 484 A.2d 1106, 1111 (1984); *Bricker v. Crane*, 118 N.H. 249, 253, 387 A.2d 321, 323 (1978). Three basic conditions must, then, be satisfied before collateral estoppel will arise: the issue subject to estoppel must be identical in each action, the first action must have resolved the issue finally on the merits, and the party to be estopped must have appeared as a party in the first action, or have been in privity with someone who did so. *See Duncan v. Clements*, 744 F.2d 48, 51 (8th Cir. 1984). These conditions must be understood, in turn, as particular elements of the more general requirement, that a party against whom estoppel is pleaded must have had a full and fair prior opportunity to litigate the issue or fact in question. *See Sanderson v. Balfour*, 109 N.H. 213, 216, 247 A.2d 185, 187 (1968); *Duncan v. Clements supra.*

We will assume, *arguendo*, that the first two conditions were satisfied. With respect to the identity of issues, we take Daigle's motion for entry of judgment on "liability" in the action against Pace to refer to the determinations that Pace assaulted and thereby injured Daigle while acting under color of State law, as established by the jury's special findings in the first trial. In so assuming, however, we are admittedly giving Daigle's vague pleading a favorably narrow reading. If the motion for judgment on "liability" was meant to include liability for punitive damages in some amount under 42 U.S.C. § 1983, that motion could not have been granted without a prior finding that Pace injured Daigle with reckless or callous indifference to Daigle's federally protected rights or with evil motive or intent to violate federal law. *Smith v. Wade*, 461 U.S. 30, 51, 56 (1983). Such findings were made neither expressly nor by necessary implication at the first trial. Since, however, Daigle's motion for judgment against Pace did not refer to any but compensatory damages, we infer that he did not seek an estoppel going beyond the first action's special findings of assault, causation and color of law.

We will assume, further, that the first action resolved these issues not only on the merits but also with sufficient finality to raise an estoppel. Although the requirement of finality is among those issues of collateral estoppel law that have not received definitive appellate treatment in this jurisdiction, *see generally Caouette v. New Ipswich, supra* at 554–55, 484 A.2d at 1111–12; *but see Wright v. Clark Equipment Co.*, 125 N.H. 299, 302, 480 A.2d 146, 147 (1984), we will accept Daigle's position, without ruling upon it, that the determinations of the issues in question were "final," even though Portsmouth had filed a notice of appeal from the judgment entered after the first trial. *See* RESTATEMENT (SECOND) OF JUDGMENTS § 13 comment *f* (1982) (better view that judgment is final despite taking of an appeal of law).

Nothing, however, turns on the assumptions we have made about the satisfaction of these first two conditions for collateral estoppel, because the third requirement has not been fulfilled. Daigle recognizes, of course, that Pace was not a party to any action litigated in the first trial, but he argues that Pace was in privity with a party, the City of Portsmouth, both because of the employment relationship between Pace and the city, and because of the city's obligation in certain circumstances to indemnify Pace against any judgment. To understand why these arguments are unsound, it is best to start with the general concept of privity and a consideration of the circumstances in which it can be said to exist.

The relationship between party and non-party implied by a finding of privity in the estoppel context has been described as one of "virtual representation," *Aerojet-General Corporation v. Askew*, 511 F.2d 710, 719 (5th Cir.), *cert. denied*, 423 U.S. 908 (1975), and "substantial identity," *United States v. ITT Rayonier, Inc.*, 627 F.2d 996, 1003 (9th Cir. 1980) (quoting *Chicago, R.I. & P. Ry. v. Schendel*, 270 U.S. 611, 621 (1926)). These conclusory phrases imply not a formal, but a functional, relationship, in which, at a minimum, the interests of the non-party "were in fact represented and protected in the [prior] litigation. . . ." *Waters v. Hedberg*, 126 N.H. 546, 549, 496 A.2d 333, 335 (1985).

Such a functional relationship may be found to exist, for example, when an employee takes control of the defense of a *respondeat superior* claim against his employer based on his own acts. *Id. See* RESTATEMENT (SECOND) OF JUDGMENTS § 39 (1982) (a person who controls, or substantially participates in controlling, the presentation on behalf of a party is bound by the determination of an issue decided, as though he were himself a party). Similarly, if

a non-party authorizes a party in litigation to represent his interests, he may be bound by the determination of an issue decided. *Aerojet General Corporation v. Askew supra;* RESTATE-MENT, *supra* § 41(2) (a person represented by a party invested with authority is bound). As these two simple examples indicate, a finding of privity is simply a conclusion that something in the relationship of party and non-party justifies holding the latter to the result reached in litigation in which only the former is named. In our examples, that something may be the actual participation of the non-party or it may be his consent to the representation by another. In each instance, however, the justification rests upon a substantial equitable consideration, not on a merely formal relationship.

Given this functional concept, there is no apparent basis in the record of the first trial for finding privity between Pace and Portsmouth. There is no indication that Pace participated in the conduct of the first trial beyond a brief appearance as a witness, or that he gave any representational authority either to the city, or to the city's insurer or its counsel. Nor did Portsmouth purport to represent Pace's personal interest. The city, indeed, raised one defense on its own behalf that was entirely consistent with a finding of liability against the individual officers, including Pace, when it claimed at trial and on appeal that any wrongdoing by the officers was outside the scope of their authority as city employees.

Nor should we forget that the trial court sustained Pace's objection that he would have insufficient time to prepare if he were forced to go to trial with Portsmouth and the other individuals on the date previously set in their cases. It would be outrageous for the judicial system to accept Pace's claim that he could not be adequately prepared by the date of the first trial, only to bind him to its result by applying a doctrine of estoppel resting on the assumption that the party to be estopped had a full and fair opportunity to litigate in the earlier trial.

It is against this reasoning that Daigle asks us to adopt two exceptional rules that would mandate estoppel against Pace. First, he argues that the relationship of employer and employee should somehow justify dispensing with normal privity requirements. On this theory of privity by employment, whenever derivative liability was found against an employer on account of his employee's act, the employee would be subject to collateral estoppel, and every such judgment against a governmental employer in its official capacity would stand as a predicate for resolving issues against the employee when sued in his personal capacity.

The cases that Daigle cites, however, do not support this position. *Pinette v. Pinette*, 106 N.H. 345, 211 A.2d 403 (1965), for example, in effect did no more than apply collateral estoppel defensively in an action against an employee, when his employer had successfully defended himself in a prior derivative liability action by asserting a defense common to employer and employee. Again, *Cox v. City of Freeman*, 321 F.2d 887 (8th Cir. 1963), recognized, not the offensive collateral estoppel asserted by Daigle, but a servant's defensive use of a release given to a master, when the only issue in a prior action against the master was the servant's negligence. *Makariw v. Rinard*, 222 F. Supp. 336 (E.D. Penn. 1963), upon which Daigle purports to rely, was overruled at 336 F.2d 333 (3d Cir. 1964); the case as decided by the court of appeals held that a prior judgment for the defendant in an action brought by an employer could not estop his employee in a later action. The court observed, quite contrary to Daigle's contention, that "[t]he relation of employer and employee, in and of itself, does not confer upon the employer any power to represent or to bind the employee in litigation." *Id.* at 335–36.

Nor does Daigle fare any better among the commentators. The result he urges upon us would run counter to the rule of *res judicata*, that "[a] party appearing in an action in one capacity, individual or representative, is not thereby bound by or entitled to the benefits of the rules of *res judicata* in a subsequent action in which he appears in another capacity." RESTATEMENT (SECOND) OF JUDGMENTS § 36(2). Thus, "a judgment against a government does not bind its officials in subsequent litigation that asserts a personal liability against officials. And . . . an official who has litigated in his official capacity is not precluded from relitigation in his personal capacity." 18 C. WRIGHT AND A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 4458 (1981); *Gorza v. Henderson*, 779 F.2d 390 (7th Cir. 1985).

We reach the same conclusions. In the ultimate analysis, we reject privity by employment for the basic reason that an employer representing himself does not necessarily defend the interest of the employee whose behavior has become the occasion for legal action. There is, rather, a potential for conflict between their respective interests, and this case illustrates it well: the employer's option to defend by claiming that its employee acted outside the scope of his employment is an option to defend the employer by sacrificing the employee. A rule of law that would estop the employee by the results of his employer's litigation would thus

create a conflict of interest both for the employer and for the employer's counsel. This can be avoided only if the employer in a specific case waives any defense based upon the scope of employment, or if the law generally follows the Restatement position and rejects Daigle's argument that privity follows employment.

Daigle's second argument for applying an exceptional privity rule rests not on the contractual relationship between the city and Pace, but upon the statutory obligation imposed on the city under certain circumstances by RSA 31:106 (Supp. 1986) to indemnify an employee against the judgment, costs and fees incurred in a civil rights action grounded in federal law. Daigle argues in effect that Pace enjoys a right to indemnification that practically eliminates both personal liability and any distinction between employee and employer, so that the determination of any issue in an action against one should bind the other. *See Laffoon v. Waterman S.S. Corp.*, 111 F. Supp. 923, 929 (S.D.N.Y. 1953); RESTATEMENT, *supra* § 57 (conditions under which judgment against indemnitee will bind indemnitor in later action for indemnification).

 Whether there are circumstances in which a right of indemnification should automatically satisfy the policy considerations underlying collateral estoppel's privity requirement is not an issue that we need decide in this case, however, because two limitations on the applicability of RSA 31:106 (Supp. 1986) preclude any inference of privity, even on Daigle's theory. The statute provides no indemnification unless "the indemnified person . . . was acting within the scope of his employment or office" and "the act or omission was not committed with malice." *Id.* We have just seen that the first condition necessarily creates a conflict between the interests of the employee and the municipality, unless the latter concedes that any act of the employee was within the scope of employment. Absent that concession, as in this case, the employer and employee cannot enjoy the genuine identity of interest that privity implies. There is, moreover, a further stumbling block for Daigle's position in the second statutory condition, which precludes indemnification for liability arising from malicious acts and thus potentially bars any indemnification for a § 1983 judgment for punitive damages, such as Daigle sought in the action against Pace. *Compare Smith v. Wade*, 461 U.S. at 56, *with Johnsen v. Fernald*, 120 N.H. 440, 416 A.2d 1367 (1980). The upshot in this case is the absence of any justification for finding privity between the city and

Pace, so as to estop the latter from contesting his personal liability at the second trial.

## II.

We now confront the significance of the second jury's special finding that Pace did not assault Daigle, which the city points out is inconsistent on its face with the first jury's special finding that he did. The city argues that the verdict for Pace in the second trial entitles the city both to an order vacating the earlier judgment against it, and to the entry of judgment in its favor notwithstanding the verdict in the first trial. The theory presupposed by the city's argument is not, of course, collateral estoppel, under which an earlier finding is preclusive in a subsequent action, but rather the converse position that the subsequent finding should entitle it to vacate the inconsistent verdict in the prior action. We emphasize that the claim that we consider here questions the earlier verdict solely on the ground of its inconsistency with the later one; our discussion and holding are likewise confined, and nothing in this opinion should be read to limit the authority of a trial court to examine one or both of two inconsistent verdicts as resting on plain mistake, being conclusively against the weight of the evidence or offending other recognized standards for post-verdict review. *See, e.g., Wisutskie v. Malouin,* 88 N.H. 242, 186 A. 769 (1936).

Although the city cites *Hopps v. Utica Mutual Insurance Co.,* 127 N.H. 508, 506 A.2d 294 (1985) as authority, *Hopps* dealt with collateral estoppel and is not in point. The city cites no other New Hampshire authority for its position, and we are unable to find any unobjectionable basis for adopting the rule that the city advocates.

Discussions of the problem of inconsistent verdicts commonly begin with *Dunn v. United States,* 284 U.S. 390 (1932), in which the Court held, in Justice Holmes's last opinion, that inconsistency of simultaneous jury verdicts rendered against one defendant on a multiple count criminal indictment did not entitle the defendant to relief. *United States v. Dotterweich,* 320 U.S. 277, 279 (1943), applied the analogous rule where separate indictments against different defendants were tried together. Although these cases must be read in the light of *Ashe v. Swenson,* 397 U.S. 436, 445 (1970), recognizing collateral estoppel as a fifth amendment limitation upon subsequent prosecution of a given defendant, the general rule allowing inconsistent criminal jury verdicts retains

unabated vitality today. *See United States v. Powell,* 469 U.S. 57 (1984); *State v. Kaplan,* 124 N.H. 382, 469 A.2d 1354 (1983).

While there is less certain authority for accepting inconsistency between civil verdicts, assuming no *res judicata* or collateral estoppel, probably both Justice Brandeis, *see Fairmount Glass Works v. Coal Co.,* 287 U.S. 474, 485 (1938), and Judge Learned Hand, *see Jayne v. Mason and Dixon Lines,* 124 F.2d 317, 319 (2d Cir. 1941), assumed that the rule would be the same as it is in criminal cases. *See also* A. Bickel, *Judge and Jury—Inconsistent Verdicts in Federal Courts,* 63 HARV. L. REV. 649, 653–55 (1950). Although there is contrary authority, *see generally, e.g.,* Note, *Inconsistent Verdicts in Civil Cases,* 45 HARV. L. REV. 1230, 1234-35 (1931) (when master is found derivatively liable for acts of servant who obtains favorable verdict in later trial, preferable view would award new trial to master), we conclude that *Dunn* and *Dotterweich* point to the sounder rule in the situation before us.

*Dunn,* to be sure, rested in part on a view of *res judicata* that is now obsolete, *compare Dunn v. United States, supra* at 393, *with United States v. Powell, supra* at 64; but Justice Holmes's principal line of reasoning still merits acceptance today. Although it may be assumed that one of the two inconsistent verdicts is wrong, their inconsistency does not, standing alone, indicate where the error lies. *See Dunn, supra* at 393 (no reason to favor defendants as a class by assuming that an inconsistent verdict of conviction was erroneous, since jury lenity is just as probable). If we were to vacate each verdict, one of our decisions would presumably be wrong on the merits. If we were to vacate only one, we would never know which one to choose. Thus the fact of inconsistency would never indicate how to make matters better and not worse by granting "relief." At most, we could be sure of an increased trial load, with no assurance that the same result would not occur again.

 If that reasoning leaves the city's case for relief seeming rather weak, it appears weaker still when we realize that although two verdicts may be facially inconsistent, each may be sound. *See* Bickel, *supra* at 654–55. Differences in evidence presented, and different conclusions on subtle issues of weight and credibility, can lead to apparent inconsistency without either jury being at fault or in error.

We have to admit, then, that our best efforts in disturbing inconsistent verdicts would not have a better-than-even chance to improve on the substance of justice, and might well leave matters the worse for our good intentions. What we cannot hope to improve, we had better leave alone.

As against this counsel of modesty, the city offers only one further consideration that we have not mentioned. It cites *City of Los Angeles v. Heller,* 106 S. Ct. 1571 (1986), in which the Supreme Court of the United States sustained the dismissal of a § 1983 derivative liability claim against a city and its police commission, after a jury had returned a verdict for the individual police officer from whose conduct the municipal liability was allegedly derived. The court observed that "if the [officer] inflicted no constitutional injury . . . , it is inconceivable that [the city and commissioners] could be liable. . . ." *Id.* at 1573.

Although the quoted language, in isolation, would support the city here, *Heller* is ultimately unpersuasive as authority for the city's position. The case is not, of course, directly in point, since it involved the application of § 1983, whereas Portsmouth is liable under State common law. More significantly, however, an analysis of the facts indicates that the result reached in the case is merely what a most basic application of collateral estoppel would require. The individual police officer on whose conduct any derivative liability depended was first found to be without liability. Because he raised no affirmative defenses, that earlier verdict in his favor and against the plaintiff necessarily resolved the issue of fault upon which the plaintiff's later derivative liability claim against the city and its police commissioners depended. The plaintiff was therefore collaterally estopped to relitigate the common issue, and the municipal defendants were entitled to dismissal.

Whether the language of the majority opinion in *Heller* comports with a sound view of constitutional law under § 1983 is not for us to say. *But see id.* at 1573 (Stevens, J., dissenting). What we do say is simply that, on its facts, *Heller* held nothing more than collateral estoppel would require, by precluding the later relitigation of an essential issue upon which the plaintiff lost in an earlier trial. *Heller* is therefore without application to the case before us, where the city claims that a later determination should entitle it to relief from a prior judgment.

## III.

Having determined that the verdicts offend neither the principle of collateral estoppel nor any prohibition against inconsistency *per se,* we find nothing in the relationship between the verdicts that calls for appellate relief. We therefore turn to the assignments of error said to have been committed at or following the first trial, as raised either by Portsmouth's appeal or by Daigle's cross appeal on the issue of entitlement to attorney's fees.

 Portsmouth first claims that the trial judge erred in allowing the jury to consider Pace's conduct as a source of derivative liability, arguing that no such "claim [was] presented by the pleadings [or] otherwise referred to by either party," and citing *Clinical Lab Products, Inc. v. Martina*, 121 N.H. 989, 990–91, 437 A.2d 285, 286 (1981).

The contention has no merit. The declaration of the writ brought against the city alleged derivative liability for acts of its "agent police officers," otherwise described as "police officers as yet unknown." From the start, then, the pleadings rested liability on the acts of individuals not identified therein by name, which is exactly what the jury found.

Allowing the jury to hold the city liable for Pace's conduct was justified, however, by much more than mere consistency with the pleadings. Although the processes of discovery in the actions against the city and the individuals did not immediately identify Pace as one of the unknown officers, we will see in some detail below that a memorandum in Portsmouth's own records indicated that Pace was probably the assailant. Seven months before trial, plaintiff's counsel successfully battled for the disclosure of that memorandum, following which the plaintiff began the separate action against Pace and sought to join it for trial with all the others. Thereafter, the claim that Pace was one such individual who had injured Daigle was a subject of repeated reference by each party.

The city thus knew long before trial that Pace's conduct was a focus of the liability claim, and the trial proceeded accordingly. In his opening statement, plaintiff's counsel described the plaintiff's initial identification of Pace as his attacker and referred to Pace's admission that he had committed the assault. Counsel described the other officers as having acted in concert with Pace, as having aided and encouraged him, and as having condoned his conduct. The jury was presented with evidence identifying Pace as the assailant, and at the end of the trial counsel argued that "[w]e proved beyond a shadow of a doubt that Mr. Pace was the officer that did it. We proved beyond a doubt."

To claim, then, that the verdict against Portsmouth based on the finding of assault by Pace offends the rule in *Clinical Lab Products, Inc. v. Martina*, 121 N.H. at 990–91, 437 A.2d at 286 is clearly mistaken. And to state, as Portsmouth's brief does, that the finding was not "claimed, requested or argued by the plaintiff" is patently irresponsible.

## IV.

Portsmouth next raises a series of assignments of error challenging the trial court's application of the central doctrine of *respondeat superior*, that the employer may be held vicariously responsible because the employee was acting within the scope of his employment when his tortious act injured the plaintiff. *See Richard v. Company*, 79 N.H. 380, 383, 109 A. 88, 91–92 (1920); RESTATEMENT (SECOND) OF AGENCY § 219(1). On the one hand, Portsmouth asserts that there was no evidence on which the jury could have found that Pace was acting for the city at the time in question; on the other hand, it maintains that the intentional and malicious character of the assault on Daigle necessarily placed the injurious acts outside the scope of any police officer's official duties. Accordingly, the city argues that the trial court erred in failing to rule as a matter of law that the city was free from derivative liability for the injuries alleged, and in refusing to dismiss the derivative liability claim. It submits, further, that the trial court compounded these errors by giving jury instructions on derivative liability that erroneously failed to explain the standards under which the jury should have considered the claim that the city should be held responsible for Pace's conduct.

The city's first argument, that there was no evidence of any assaultive conduct by Pace falling within the scope of his employment, rests on the uncontested fact that Pace was off-duty when the assault occurred, which was more than two hours after the end of his previous shift. There was, moreover, no evidence that the police department specifically called Pace or ordered him personally to respond to the call for help, and the duty officer at the time testified that he had not done so. The city therefore argues that there was no evidence that any assault by Pace occurred within the time he was authorized to act for the city, *see* RESTATEMENT (SECOND) OF AGENCY § 228(1)(b), § 223 (1958), with the result that the city was entitled to dismissal of any claim based on Pace's acts.

This position, however, assumes an unduly narrow conception of the temporal scope of police employment. Although it is true that for conduct to fall within the scope of employment it must occur "substantially within the authorized time," RESTATEMENT, *supra* § 228(1)(b), or "during a period which has a reasonable connection with the authorized period," RESTATEMENT, *supra* § 233, this general rule is not blind to the reality that some employees are understood to have the obligation, or at least the option, to perform official duties whenever the need may arise. When an employee is

thus on-call, and he acts to perform a normally authorized task during an off-duty period, his activity is within the scope of employment and his employer may be held liable for his tortious performance. *See* RESTATEMENT, *supra* § 233 comment *c*. Such was the case here.

■ There was evidence that Pace, like other Portsmouth officers, was on call in one or both of these senses. The chief of the department testified that an officer has police power and law enforcement responsibility twenty-four hours a day, and there was evidence that Pace not only had acted officially during off-duty time in the past, but even had received a departmental commendation for such supplementary service. From this evidence it could be inferred that services during off-duty hours were authorized and approved, and the jury could therefore find that Pace was authorized to exercise law enforcement power at the time in question. The city had no right to any ruling that Pace must perforce have acted outside the temporal scope of his employment, and any such conclusion, indeed, would have been error.

Portsmouth's next arguments are equally unavailing. The city claims that the serious degree of unreasonable force employed by Daigle's assailant entitled it to judgment as a matter of law, for any one of three reasons: the facts of the assault indicated no intent to discharge a law enforcement responsibility; the force used was too excessive to fall within the scope of authorized police activity; and the force exceeded the degree of zealous behavior that police officials could have foreseen.

■ In considering the first of these reasons, we start by agreeing with the city's view of the law. The Restatement takes the position that behavior within the scope of employment must be actuated at least in part by an object to serve the employer, RESTATEMENT, *supra* § 228(1)(c), and this view accords with an earlier statement of the New Hampshire rule that the act must have been performed in "furtherance" of the employer's business. *Richard v. Company*, 79 N.H. 380, 383, 109 A. 88, 91 (1920). We do not, however, agree with the city's view that the record is devoid of evidence that Pace was actuated to some degree by an object to discharge a law enforcement responsibility. The circumstantial evidence was that Pace learned of the call for back-up and went to the scene to help apprehend a thief. There was no indication that he bore any personal animus against Daigle; the evidence was, rather, that he had frequently beaten suspects, from which the jury could infer that Pace believed it was appropriate to rough them up in the

course of serving the law enforcement objectives of capturing the guilty and establishing their guilt.

This case is thus decidedly unlike *Fitzgerald v. McCutcheon*, 410 A.2d 1270 (Pa. Super. Ct. 1979), which the city cites for support. In *Fitzgerald*, an off-duty police officer shot a neighbor, whom the officer believed had taken his car keys in order to prevent the officer from driving while intoxicated. Because the only connection between the shooting and the officer's job was his authority to carry a firearm at all times, the Pennsylvania court found purely personal motivation for the shooting. The officer in *Fitzgerald* did not go to the scene of the tortious conduct for the apparent purpose of apprehending a criminal; there was evidence that the officer in this case went to the scene for just that purpose. *Fitzgerald* does not, therefore, support the city's demand for judgment as a matter of law.

 As to the city's second reason, relating to the significance of outrageous conduct, the city's view of the law is not wholly clear to us. There are places in its brief where the city argues that the brutal or even criminal character of an assault is merely a consideration, albeit a significant one, in deciding whether the assaultive acts are within the scope of employment. Elsewhere the city seems to suggest that such brutality must be outside the scope of police employment as a matter of law. In any event, we agree with the Restatement view that the criminal or tortious character of an employee's act does not, *ipso facto*, remove the act from the scope of employment. RESTATEMENT, *supra* § 231. It has long been accepted in New Hampshire law that even malice in the use of excessive force will not require a finding that the force is outside the scope of employment, if at least some degree of force would be appropriate. *Richard v. Company, supra* at 384, 109 A. at 91. (We need not choose here between the apparent view of *Richard*, that force by an employee in such a position is always within the scope of employment so long as it is exerted in, and for the purpose of, doing the employer's business, and the view espoused by the Restatement, that the degree of outrageousness may lead to the conclusion that the acts are outside the scope.) Suffice it to say that neither the malice of the employee, nor the tortiousness or criminality of his conduct, necessarily excuses the employer from derivative liability, and the city was not entitled to judgment as a matter of law because of Pace's outrageous behavior.

 Consideration of the third and closely related reason leads to the same result. We have never had occasion to decide whether the foreseeability of the degree of an employee's misuse of force should set the limit to the employer's derivative liability. While this is the Restatement's position, *see* RESTATEMENT, *supra* § 228(1)(d), § 229 comment *b*, § 231 comment *a*, § 245, *Richard* says nothing explicitly about it. But assuming *arguendo* that foreseeability does set an outer limit to an employer's exposure, the city was not entitled to judgment as a matter of law in this instance. Some excessive force in the use of guns and nightsticks is always foreseeable; and, as we noted above, there was evidence in this case that Pace's superiors knew, or should have known, that he had a proclivity toward such violence. Even on the Restatement's view of the significance of foreseeability, then, the city was not entitled to dismissal as a matter of law.

## V.

The next issue related to scope of employment is the sufficiency of the following jury instructions:

> "By 'scope of employment' I mean that the employee must have been acting in furtherance of his employer's business. You do not have to conclude that the City had ordered him out there or was even aware that he was out there or of his conduct. In order to find the City liable the question you would ask yourself was, again if you come this far, in this particular count, the question, you ask yourself, was the officer engaged in police business or on a personal matter when he struck Mr. Daigle.
>
> For example, if there is a trespasser on a bus someone that doesn't belong on the bus, the bus driver in attempting to throw him off the bus beats him up, that bus driver is acting in the course of his employment. He is acting in furtherance of the employer's business. On the other hand, if the bus driver gets into an argument with the same individual over the individual's wife or the bus driver's wife and then assaults him the bus driver is not acting in the furtherance of the employer's business and not acting within the scope of his employment.
>
> You must decide, looking at all the circumstances, whether or not the police officer Pace was acting in the performance of the business of Portsmouth Police Department when he assaulted Mr. Daigle, if that is what

you have found. If you have answered yes to that question, then you would find a verdict for the plaintiff against the City of Portsmouth."

We can agree that these instructions did not expressly cover all of the issues that may be raised about scope of employment. They did not, for example, advert to authorized time, or speak in any detail about the nature of the employment. We do not, however, find anything in the city's objections to the charge that requires reversal.

 Before reaching the limited substance of those objections, we must pause for a word about the manner in which the trial court allowed the city to raise them. At the conclusion of the charge and after the jury had withdrawn to begin deliberations, the court "indicated that counsel will have a period of time in which to review the . . . charge . . . and to submit exceptions which will be considered . . . to be timely filed." At some time later, the record does not indicate just when, the city filed a written statement of objections. Despite the trial court's liberality in allowing this practice, the objections so filed cannot be considered as timely. The process of stating objections to the charge is not a mere predicate for a later appeal; the object is to advise the trial judge of a claim of error that can be addressed before any damage is beyond correction in the trial court. Hence, the provision of Superior Court Rule 72, that all "objections to the charge shall be considered as waived unless taken on the record before the jury retires." The practical need reflected in this rule will not ordinarily permit any waiver of its terms.

Assuming *arguendo* that the untimely objections now before us should be considered on their merits, they raise no basis for reversal. Most of them in fact are objections to the court's refusal to dismiss the derivative liability claim on grounds discussed above. Although some of them refer to certain requests for instructions, the requests are not included in the record transferred, and we are therefore in no position to consider them. The only objections to the charge that we can consider claim that the court "failed to instruct the jury relative to the important concept of 'Authority' . . . in respect to scope of employment . . . . [The court] should have defined scope of employment to require analysis, of conduct from the standpoint of the employer, not simply the subjective intent of this off-duty employee."

 We read this statement as objecting to the charge's emphasis on the plaintiff's burden to prove that Pace intended to accomplish a law enforcement objective, as against the trial judge's failure to explain in any detail that the plaintiff must prove that Pace's acts were authorized, or incidental to the performance of authorized acts. *See* RESTATEMENT, *supra* § 228(1)(a), § 229(1) and (2). Although we agree that the instructions do carry this relative emphasis, it is not clear to us just how the city would have wished the instructions to be modified, and we cannot in any case regard them as misleading to the jury. There was no serious question that, as a police officer, Pace was authorized to apprehend criminal suspects, and to use some degree of force as an incident to apprehension. There was a serious question, however, about Pace's object in resorting to the degree of force that he employed, and the trial court accordingly emphasized the issue of intent. If the city meant to raise the further claim that it should not be held liable unless Pace's superiors could have foreseen the particular degree of force used, that was not reasonably apparent from the objection as stated. Thus, while the instructions could have been more comprehensive, and while timely and properly focused objections could have been helpful in suggesting appropriate detail, the charge was not misleading in emphasizing the disputed issue of intent, and we therefore see no reversible error. *See Poulin v. Provost*, 114 N.H. 263, 264, 319 A.2d 296, 298 (1974).

## VI.

The last assignment of error said to have been committed during trial preserves an evidentiary issue, which was raised by the city's objection to the introduction into evidence of a document found in a police department file, to which we have alluded before. After a heated discovery contest, the city produced the following note written by detective George Krook of the Portsmouth Police Department, memorializing an oral report to him by a patrolman, Robert Hersey:

"Had been drinking 7-8-83
 2:05 PM

Bob Hersey
Came into office to talk about Daigle case. Hersey said that he remembers Al Pace saying that he did a woopie on Daigle and something about Jim Truman [sic] (Newington P.D.) saying something about seeing Daigle running from the burglary and he knew who he was and there was no sense chasing him or words to that effect.

Hersey said that he didn't know if Pace was telling the truth or just bragging. Hersey said that Pace was capeable [sic] of doing it to Daigle. He said that Pace has been brutol [sic] to other people in the past. Hersey said that he thought that Pace even made the remark about teaching Daigle a lesson. Hersey said he couldn't remember the exact words that Pace said."

Over the city's objection, the trial court admitted this compound hearsay into evidence, as an admission of a party, uttered by the party's agent. The city submits that this was error, because there was no evidence that either Pace, Hersey or Krook was authorized to speak for the city or, more specifically, to make an admission relevant to liability. The city thus invokes the rule that an agent's authority to act does not necessarily carry with it any authority to speak on the subject of his action, so that "the words of the agent will be received in evidence as the admissions of the principal [only] if they were spoken within the scope of the authority of the agent to speak for the employer." E. CLEARY, MCCORMICK ON EVIDENCE 788 (3d ed. 1984).

Although this rule was once the law in this State, *see Caswell v. Maplewood Garage*, 84 N.H. 241, 244, 149 A. 746, 749–50 (1930), it will not avail the city to invoke it here, for long before this case was tried the force of *Caswell* had ebbed virtually to the vanishing point. Its attenuation was apparent in *Sargent v. Alton*, 101 N.H. 331, 333–34, 143 A.2d 411, 413 (1958), where the court cited *Caswell*, only to invert its holding by reasoning that the admission of an agent with management responsibilities was admissible against his employer, in the absence of evidence that his authority to speak was limited. This formal acknowledgment and practical repudiation of *Caswell* was followed in *Parten v. The Great Atlantic & Pacific Tea Company*, 102 N.H. 62, 65, 149 A.2d 860, 862 (1959), and again as recently as *Tullgren v. Phil Lamoy Realty Corp.*, 125 N.H. 604, 608, 484 A.2d 1144, 1147 (1984). Thus, for over a quarter of a century the *Caswell* rule has survived as little more than an object of lip service, its diminished status reflecting McCormick's criticism of the old rule as preferring the weaker evidence over the stronger, since it would exclude the agent's contemporaneous admission, even though the law would receive his later testimony to the same effect. *See* MCCORMICK ON EVIDENCE, *supra* at 643.

The trial court was therefore correct when it ruled that the employee's admissions on a subject within the scope of his employment were admissible against the employer, in the absence

of convincing evidence that the employee's authority to speak was limited. Although the city offered testimony that a patrolman was not authorized to speak for the city, the trial court need not have accorded much significance to that self-serving evidence, when weighed against the undoubted fact that a police officer is customarily obligated to make careful records of evidentiary facts surrounding the apprehension of criminal suspects, and to communicate those facts to other officers, courts and juries. The Krook report was properly admitted.

■ This conclusion survives even the city's fall-back argument, that the communications were inadmissible because they were made to other agents of the city rather than to independent third parties. This fact affects weight, however, not admissibility. *See Parten v. A. & P. Tea Co. supra* (agent's admission received in evidence against principal, even though directed to another agent, and merely overheard by the injured third party). *Contra* RESTATEMENT (SECOND) OF AGENCY § 287. While a statement intended for limited circulation may well be made without full consideration of its potential to render the principal liable, its trustworthiness does not necessarily fall to the point of inadmissibility. *See* MCCORMICK ON EVIDENCE, *supra* at 789–90.

■ While this disposes of the evidentiary issue, candor calls for us to add a further word. If the admissibility of the report were uncertain as judged under the law as it existed at the time of trial, we would not hesitate to resolve that uncertainty in favor of the trial court's decision to admit the document, since that would unquestionably be correct under the law today. Rule 801(d)(2)(D) of the New Hampshire Rules of Evidence (effective from July 1, 1985) provides that "a statement by [a] party's agent or servant concerning a matter within the scope of the party's agency or employment, made during the existence of the relationship" is not inadmissible hearsay. It is clear that under this rule the admissibility of the agent's statement turns on the subject matter of his agency, not upon specific authorization to speak. *See Crawford v. Garnier*, 719 F.2d 1317, 1324 (7th Cir. 1983). We conclude, in any case, that the report was admissible under either the old rule or the new one. *See* N.H. R. Ev. 801 (Reporter's Notes).

## VII.

The remaining issues were raised by motions filed after the close of the earlier trial. The city claimed, first, that the jury manifested so much confusion as to taint the verdict, which the city moved to

set aside under the holding in *Allen, Cummings & Co. v. Aldrich,* 29 N.H. 63, 75 (1854), that a "verdict which is so uncertain that it cannot be clearly ascertained whether the jury meant to find the issue or not, is bad." The city's occasion for invoking *Allen* was a handwritten note delivered by the jurors to the court along with the completed verdict forms:

> "We have had great difficulty reaching firm decisions and feel we must send this note.
>
> We believe the four officers erred by omission and that the true cover-up was at a higher level.
>
> We believe there was negligence and that Dale Daigle's rights were violated. We were unable to say this on the questionnaire because of the way the questions are written."

Unlike the city, however, we do not find any necessary inconsistency between the statements in the note and the verdicts rendered. On the matter of negligence, the jury could have found that Pace and his unidentified companion were negligent in failing to obtain medical attention for Daigle; nothing on the verdict forms specifically asked for a finding on that subject. Next, the jurors could have believed that Daigle's rights had been violated even though they returned a defendant's verdict in the civil rights claim against the city; the verdict form did not allow them to find the city liable unless it had a policy, practice or custom of encouraging or condoning police misconduct. As for the "cover-up," the jurors could have found that the four named officers had erred by omission in failing to disclose evidence obtained after the night of the assault, even though the jurors also found that only two of the officers had actually conspired to "cover-up" evidence of liability; and there was, finally, no inconsistency with any verdict in the finding that a cover-up did take place at a level above that of the four officers named.

## VIII.

The city next attacked the verdict for its amount of $500,000, from which it sought a reduction by an order of remittitur; *i.e.,* an order granting the plaintiff a choice between a reduced verdict or a new trial on the issue of damages. Although we have no hesitancy in affirming the trial court's denial of remittitur, we do see the need for some care in explaining the standard under which we do so.

Some prior cases have indicated that this court on appeal may directly rule upon a claim that a verdict is excessively high. *See Reid v. Spadone Machine Co.,* 119 N.H. 457, 466, 404 A.2d 1094, 1099–1100 (1979); *Loney v. Parsons,* 111 N.H. 353, 357–58, 284 A.2d 910, 913–14 (1971); *see also Johnston v. Flatley Realty Investors,* 125 N.H. 133, 137, 480 A.2d 55, 57–58 (1984). The correct rule, however, is that direct review is the responsibility of the trial judge, who may disturb a verdict as excessive (or inadequate) if its amount is "conclusively against the weight of the evidence," *Wisutskie v. Malouin,* 88 N.H. 242, 246, 186 A. 769, 771 (1936), and, specifically, may order remittitur if the verdict is "manifestly exorbitant." *Seaman v. Berry,* 114 N.H. 474, 475–76, 322 A.2d 922, 923 (1974); *see Panas v. Harakis & K-Mart Corp.,* 129 N.H. 591, 529 A.2d 976 (1987); *Lahey v. Shaw,* 123 N.H. 648, 651, 466 A.2d 911, 913 (1983) (quoting *Hanlon v. Pomeroy,* 102 N.H. 407, 409, 157 A.2d 646, 648 (1960)). Once the trial court has reviewed the amount of the verdict under this standard, we will not disturb the judge's finding unless no reasonable person could make it. *Id.* The degree of manifest exorbitance that will justify remittitur is, of course, impossible to quantify by general rule and difficult to express verbally. Our prior cases have attempted to indicate that the inconsistency with the weight of the evidence must be so great "as to warrant the belief that the jury must have been influenced by partiality or prejudice, or have been misled by some mistaken view of the merits of the case." *Id.* It is not that corruption or plain mistake are synonymous with manifest exorbitance or conclusive inconsistency with the weight of evidence, *see Wisutskie v. Malouin, supra* at 245–46, 186 A. at 771; but these examples of what might cause an improper verdict serve to suggest the heavy burden that must be carried by a party who asks the trial court to intervene by modifying the verdict's amount.

The denial of remittitur in the case before us accorded with these standards, and three considerations indicate that it was not unreasonable to sustain the verdict, despite its substantial amount. There was, first, the severity of the injuries themselves, which extended over much of Daigle's body and included a fractured skull requiring examination and treatment at a referral hospital outside the State. While the city stresses the relatively low medical expenses, under thirteen thousand dollars, as against a half million dollar verdict, this contrast does not necessarily suggest an excessive award in a case in which the jury was allowed to award enhanced damages. Thus, the second consideration supporting the verdict is the rule in *Vratsenes v. N.H. Auto, Inc.,* 112 N.H. 71, 73,

289 A.2d 66, 68 (1972), that in tort actions for "wanton, malicious, or oppressive" conduct, damages may be enhanced to reflect "the aggravating circumstances." The trial court instructed the jury that they could award enhanced, though not punitive, damages, and the jury obviously availed themselves of their discretion to do so. (While the city objected to instructions on enhanced damages, they do not press those objections on appeal. They were, in any event, general in character, and they contained no suggestion that the city should be treated differently from its employee under *Vratsenes.* We would find no apparent merit in the city's objections, even if they were before us.) The third consideration supporting the jury's award was evidence that the effects of the assault were continuing and would persist into the future. There was ample testimony that the plaintiff continued to suffer migraine headaches, dizziness, positional vertigo and seizures, and had undergone both physical and personality changes attributable to the injuries he received; and on the basis of like medical testimony, the jury was entitled to find that the plaintiff would probably experience both post-traumatic concussion syndrome and post-traumatic epilepsy caused by the assault. Since he was a young man at the time of the injury, Daigle could anticipate a long lifetime to endure the damaging effects of Pace's acts. There was nothing unreasonable in the trial court's finding that the verdict was not exorbitant.

## IX.

The final post-trial claim of error came not from the city but from Daigle, who argues in his cross-appeal from the first judgment that the court was wrong to refuse his request for an award of counsel fees against the city. We uphold the trial court.

As we noted at the outset of this opinion, Daigle brought claims against the city both on the theory of *respondeat superior* for common law torts and on the more restrictive theory of derivative liability under 42 U.S.C. § 1983; that is, for constitutional violations committed by a city employee acting under color of law and in accordance with a custom, policy or practice sanctioned by the city. In his original pleadings and his post-trial requests, Daigle sought an award of counsel fees under 42 U.S.C. § 1988, under which the court may award "reasonable attorney's fee[s]" to the "prevailing party" in a § 1983 action. *Id.*

The requirement of "prevailing party" status, however, is a hurdle that Daigle cannot clear, since the verdict in the § 1983 action was for the city, not for Daigle. There is, to be sure, authority for awarding attorney's fees to a plaintiff who prevails on a common

law claim joined with one under § 1983, when the latter claim is not reached and each grows out of the same "nucleus of facts." *See Lund v. Affleck,* 587 F.2d 75, 77 (1st Cir. 1978). But the facts of this case do not fit that rule. The jury did not fail to reach the § 1983 claim; it reached the claim and returned a verdict for the city based on a special finding that Pace had not acted in accordance with a custom, policy or practice sanctioned by the city.

 Hence, Daigle cannot in any sense be called a prevailing party in the § 1983 action, and the request for counsel fees must be rejected under the ample authority of cases holding that an adverse verdict on a § 1983 claim joined with common law counts precludes an award of fees under § 1988. *See Raley v. Fraser,* 747 F.2d 287, 290 (5th Cir. 1984); *Reil v. Arkansas Dept. of Correction,* 672 F.2d 693, 698–99 (8th Cir. 1982); *Luria Bros. & Co., Inc. v. Allen,* 672 F.2d 347, 357 (3d Cir. 1982); *Bunting v. City of Columbia,* 639 F.2d 1090, 1095 (4th Cir. 1981); *see also Russo v. State of New York,* 672 F.2d 1014, 1023 (2d Cir. 1982). In so holding we have not overlooked the fact that the special verdict forms did elicit findings that two police officers had committed civil rights violations by attempting a "cover-up," an issue which might have been pursued on a theory of derivative liability if the jury had not otherwise found the city responsible for the tort of assault. What is significant, however, is that the "cover-up" failed, and the jury did not find that any damage was caused by it. The damage flowed, rather, from the assault, for which the jury found no city responsibility under § 1983. Daigle was not, therefore, a prevailing party under § 1983, and the trial court had no authority to award fees under § 1988.

*Affirmed.*

THAYER, J., did not sit; the others concurred.