USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT ____________________ No. 95-2216 DANIEL AVERSA, ET AL., Plaintiffs, Appellants, v. UNITED STATES OF AMERICA, ET AL., Defendants, Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND [Hon. Mary M. Lisi, U.S. District Judge] ___________________ ____________________ Before Lynch, Circuit Judge, _____________ Campbell and Bownes, Senior Circuit Judges. _____________________ ____________________ Francis G. Murphy, with whom Kathryn B. Johnston and Hall, Hess, _________________ ____________________ ____________ Kenison, Stewart, Murphy, & Keefe, P.A. were on brief for appellants. _______________________________________ Richard A. Olderman, Attorney, with whom Barbara L. Herwig, _____________________ ___________________ Attorney, Civil Division, Department of Justice, Paul M. Gagnon, _______________ United States Attorney, and Frank W. Hunger, Assistant Attorney ________________ General, were on brief for appellees. ____________________ October 21, 1996 ____________________ BOWNES, Senior Circuit Judge. Daniel and Carla BOWNES, Senior Circuit Judge. ____________________ Aversa filed a civil action alleging that Patrick Walsh, an Assistant United States Attorney in the District of New Hampshire, and Kenneth Claunch, Chief of the Criminal Investigation Division of the Internal Revenue Service, falsely stated and implied to the local and national news media that Daniel Aversa was involved in laundering illegally-gotten money, tax evasion, drug trafficking and racketeering activity, and thus committed slander and other common law torts under New Hampshire law and deprived him of his right to liberty guaranteed by the Constitution of the United States. Senior District Judge Martin F. Loughlin, who presided over the related criminal case, found the statements to have been "totally false," "misleading," "outrageous," "self-serving" and "unfair." In this civil action, Magistrate Judge Lovegreen and District Judge Mary Lisi agreed with Judge Loughlin's condemnation, adding that the defendants' conduct showed "extraordinarily poor judgment" and was "lacking in professionalism." The district court, however, dismissed the Aversas' lawsuit, finding that Walsh and Claunch were absolutely immune from suit for the common law torts, and qualifiedly immune from suit for the constitutional tort.  The purpose of immunity -- absolute or qualified -- is not to protect erring federal officials from the -2- 2 consequences of their injurious acts, but to safeguard the public interest in having responsible governmental employees faithfully carry out their duties without fear of protracted litigation in unfounded damage suits. See Wyatt v. Cole, 112 ___ _____________ S. Ct. 1827, 1833 (1992); Westfall v. Erwin, 484 U.S. 292, _________________ 295 (1988); Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982); ____________________ Scheuer v. Rhodes, 416 U.S. 232, 241-42 (1974); Barr v. ___________________ _______ Matteo, 360 U.S. 564, 565 (1959) (plurality opinion); Wood v. ______ _______ United States, 995 F.2d 1122, 1126 (1st Cir. 1993); ______________ Buenrostro v. Collazo, 973 F.2d 39, 42 (1st Cir. 1992). In _____________________ obvious tension with that objective is that well-founded damage suits promote the public interest in compensating victims and deterring unlawful conduct. Harlow, 457 U.S. at ______ 814, 819; Barr, 360 U.S. at 576. ____ The law of immunity seeks a balance between the evils inevitable in any available alternative. Harlow, 457 ______ U.S. at 813; Wood, 995 F.2d at 1126. Thus, a federal ____ employee who allegedly commits a common law tort will be absolutely immune from suit if he acted within the scope of his federal employment, 28 U.S.C. 2679(b)(1), but the plaintiff can proceed against the government unless some exception to the Federal Tort Claims Act applies. And a federal official is qualifiedly immune from suit for an alleged constitutional tort if his "conduct [did] not violate clearly established . . . constitutional rights of which a -3- 3 reasonable person would have known," Harlow, 457 U.S. at 818, ______ even though his actions may have been "despicable and wrongful" in some more general sense. Souza v. Pina, 53 F.3d _____________ 423, 427 (1st Cir. 1995).  Although we affirm, we believe that the false and misleading information allegedly disseminated to the press in Aversa's criminal case deserves more than condemnation, and therefore refer the matter to the appropriate disciplinary bodies.  I. FACTUAL AND PROCEDURAL BACKGROUND I. FACTUAL AND PROCEDURAL BACKGROUND Except where otherwise noted, the following facts are taken from Aversa's complaint. Daniel Aversa ("Aversa") and Vincent Mento ("Mento") were partners in a legitimate real estate business.1 In January of 1989, they sold a parcel of land, splitting the proceeds. At the same time, Aversa was experiencing marital difficulties with his wife Carla. In order to conceal some of his assets from his wife in the event of a divorce, Aversa asked Mento if he could deposit his share of the proceeds, amounting to $55,000, into Mento's personal bank account. Mento agreed.  Both men were aware that domestic financial institutions were required to report currency transactions in excess of $10,000 to the Secretary of the Treasury, see 31 ___  ____________________ 1. Vincent and Shirley Mento were plaintiffs in this action but did not pursue an appeal. -4- 4 U.S.C. 5313(a); 31 C.F.R. 103.22(a)(1), and wished to avoid causing a Currency Transaction Report ("CTR") to be filed. Aversa therefore made a series of deposits into Mento's account in sums just under $10,000.2 At the time, Aversa was unaware that structuring the transactions to avoid causing a CTR to be filed was a crime under federal law. See ___ 31 U.S.C. 5324(a). In June of 1990, IRS agents contacted Aversa and informed him that he was under investigation for structuring deposits. He immediately met with Assistant United States Attorney Walsh, and without an attorney present, explained that he was hiding the money from his wife, that it was not derived from an illegal source, and that he did not know that structuring was illegal. Walsh told Aversa that he and Mento had been under investigation for some time and that he had no reason to believe the money was anything but "clean," but said that he did not need to prove that it was derived from an illegal source or that Aversa knew that structuring was illegal. Walsh told Aversa that there was no reason to seek counsel and encouraged him to plead guilty because all that  ____________________ 2. Aversa's purpose in transferring the money out of his account was to conceal it from his wife, a purpose we do not condone. But Judge Loughlin found that Aversa and Mento wished to avoid a CTR being filed because they believed it would cause the Internal Revenue Service to hold Mento responsible for the taxes on the amount, and that Aversa and Mento each reported his share of the proceeds on his own tax return.  -5- 5 was needed for a conviction was what Aversa had just told him. In a later meeting with Aversa's counsel, Walsh said that he previously had been successful in prosecuting individuals for structuring in Miami, but that this case would be his first involving "clean money," and he planned to use it to "set a precedent" and "educate the public about the currency transaction reporting requirements." On June 28, 1990, Walsh obtained an indictment charging Aversa and Mento with conspiracy, structuring, and making false statements, and Aversa alone with attempting to cause a domestic financial institution to file a report containing a material omission or misstatement of fact. That same day, Walsh, Claunch, and the United States Attorney for the District of New Hampshire, Jeffrey R. Howard (with whom Aversa alleged Walsh and Claunch conspired but who was not joined as a defendant) issued a press release and held a press conference announcing to the local and national news media, which reported to the public, that Aversa and Mento had been arrested for money laundering. Walsh and Claunch knew that Aversa and Mento were not involved in laundering illegally-gotten money, or in drug trafficking, tax evasion or organized crime, but created the impression that they were. An article in the Boston Globe dated June 29, 1990, reported:  Walsh said money laundering is usually done for purposes of tax evasion, drug -6- 6 dealing or organized crime. He would not say if either of yesterday's indictments are related to these activities, but added after the news conference that "it would be a fair statement" to say authorities are looking into how [these] men amassed the sums of money involved. Walsh also stated that Aversa faced up to forty years in prison and added that the investigation was continuing and more charges would be filed. A front-page article in the Concord Monitor dated June 29, 1990 reported: The indictments are a sign that prosecutors are serious about using the money laundering laws, a tool that allows them to charge people for handling money illegally without having to prove that the money was gained illegally, said Jeffrey Howard, U.S.A. attorney for New Hampshire. "The indictments are important because they are examples of the commitment the I.R.S. has made . . . to use the money laundering statutes in order to ferret out tax evasion, drug trafficking and other crimes," he said. Prosecutors declined to say how Aversa and Mento got the money or why they believe the men tried to evade the currency laws. Claunch stated at the press conference that "[t]hese cases represent the IRS's commitment to ferreting out money launderers," and that the IRS wanted "to send a message that money laundering is going to be detected, investigated and prosecuted to the full extent."  -7- 7 On October 10, 1990, after Judge Loughlin granted the government's motion in limine to preclude a defense based __ ______ on ignorance of the anti-structuring law, Aversa pled guilty to structuring. The plea agreement stipulated: 1. The United States has no evidence that the currency involved in these transactions was obtained from an unlawful source. 2. The United States has no evidence that the defendant knew of the structuring provision, but states to the Court that such knowledge is not necessary to establish a violation of Section 5324. Aversa reserved his right to appeal the issue of whether a conviction under 31 U.S.C. 5324 required knowledge that structuring is illegal.  On October 17, 1990, following Mento's conviction, Walsh issued a press release in which he stated that the currency transaction reporting laws and the laws that prohibit structuring "were passed to assist in the investigation of related criminal conduct, such as narcotics trafficking, organized crime and racketeering activity and tax violations," and that these convictions would send "a strong clear message that persons who violate . . . and evade those laws will be vigorously prosecuted." Walsh made oral statements to the press stating and implying that Aversa and Mento had violated the anti-structuring law in order to further an underlying criminal enterprise, and that they -8- 8 could not account for some of the money involved in the structured transactions. No evidence had been adduced at Mento's trial that there was an underlying criminal purpose or that the source of the money was unexplained. At Aversa's and Mento's sentencing, Judge Loughlin found that Aversa and Mento would bear the stigma of the "totally false" innuendoes reported in the media for the rest of their lives. In a memorandum opinion ruling on Aversa's and Mento's post-conviction motions,3 the judge noted that the government had admitted that Aversa and Mento were "not involved in drugs and not laundering ill-gotten gains and not keeping information from the United States," and found that the prosecutors' statements to the press were "outrageous and unfair," "misleading and cruel," "self-serving and more than a little disingenuous," and "smeared the reputation of these two men."  This court vacated Aversa's and Mento's convictions, ruling that the willfulness requirement of the applicable criminal penalty provision, 31 U.S.C. 5322(a), required the government to prove the violation of a known legal duty or the reckless disregard thereof, and that an  ____________________ 3. The motions for writ of coram nobis were based on Cheek _____ _____ _____ v. United States, 111 S. Ct. 604 (1991), decided after __________________ Mento's trial. Judge Loughlin found that in light of Cheek, _____ he had erred in ruling out the defendants' proposed mistake of law defense, but found that he could not grant relief under a writ of coram nobis because other relief, in the form _____ _____ of an appeal, was available. -9- 9 unintentional, nonreckless mistake of law was a complete defense to a structuring charge. United States v. Aversa, ________________________ 984 F.2d 493, 498, 500, 502 (1st Cir. 1993) (en banc), vacated sub nom., Donovan v. United States, 114 S. Ct. 873 _______ ___ ___ _________________________ (1994).4 We remanded for a new trial, but the government elected not to proceed again against Aversa. The Aversas then brought a civil action seeking compensatory and punitive damages against Walsh, Claunch, and other unnamed defendants, alleging in Count I that the defendants, acting under color of federal law, deprived Aversa of his Fifth Amendment right to liberty; in Counts II and III that they committed the torts of slander and intentional infliction of emotional distress under New Hampshire law; and in Count IV that the defendants' conduct caused Carla Aversa to lose the consortium of her husband. The complaint alleged that Walsh and Claunch defamed Aversa for the purpose of personally benefitting in their careers, and that their false and misleading statements caused irreparable harm to Aversa's personal and business  ____________________ 4. The Supreme Court ordered our judgment in Aversa vacated ______ and the case remanded for reconsideration in light of Ratzlaf _______ v. United States, 114 S. Ct. 655 (1994), in which the Court ________________ had held that the willfulness requirement of 31 U.S.C.  5322(a) required knowledge that structuring is illegal. Id. __ at 663. Congress has since amended the statute so that willfulness is no longer required for a violation of 31 U.S.C. 5324. See Pub. L. No. 103-325, 411, 108 Stat. ___ 2160 (Sept. 23, 1994) (codified as amended at 31 U.S.C.  5322(a) (West Supp. 1996)). -10- 10 reputations and his business goodwill, caused him to be discharged from his job as an accountant, and prevented him from finding other employment as an accountant. The case was transferred from the District of New Hampshire to the District of Rhode Island. Pursuant to the Federal Employees Liability Reform and Tort Compensation Act of 1988, commonly known as the Westfall Act, the Attorney General certified that Walsh and Claunch acted within the scope of their federal employment and the United States was provisionally substituted as the party defendant. 28 U.S.C. 2679(d)(1). Aversa was permitted to depose Walsh and Claunch in aid of his challenge to the scope certification, and he submitted the depositions and various exhibits to the court.5 Thereafter, Magistrate Judge Lovegreen ruled that Walsh and Claunch were acting within the scope of their employment, thus converting the common law claims into claims against the United States under the Federal Tort Claims Act, 28 U.S.C.  2679(d)(1), 1346(b), then recommended that those claims be dismissed for lack of subject matter jurisdiction based on  ____________________ 5. The exhibits included copies of press releases dated June 28, 1990, and October 17, 1990, a newspaper article dated June 29, 1990, a transcript of Aversa's sentencing hearing on March 14, 1991, Judge Loughlin's memorandum opinion dated April 29, 1991, ruling on Aversa's and Mento's motions for writ of coram nobis, Chapter 7 of the United _____ _____ States Attorneys' Manual (1988), 28 C.F.R. 50.2, Rule 35 of the Local New Hampshire District Court Rules, Claunch's job description, and an Internal Revenue Policy Statement concerning news coverage.  -11- 11 the exception to the Federal Tort Claims Act for claims arising out of libel or slander. 28 U.S.C. 2680(h). Treating the defendants' motion to dismiss the constitutional claim as a motion for summary judgment, the magistrate judge recommended summary judgment in favor of Walsh and Claunch on the basis that they were qualifiedly immune. Magistrate Judge Lovegreen stated in his Report and Recommendation that he was in full agreement with Judge Loughlin's assessment of the defendants' conduct, and added that the "defendants' extraordinarily poor judgment in making these statements should not go unnoticed." In adopting the magistrate's Report and Recommendation in its entirety, United States District Judge Mary Lisi found that the defendants' "publication of misleading information [was] lacking in professionalism and deserving of the opprobrium articulated by Judge Loughlin and Magistrate Lovegreen." II. DISCUSSION II. DISCUSSION A. The Common Law Claims A. The Common Law Claims As an initial matter, the Aversas' complaint describes a claim for slander under New Hampshire law, which defines the tort as follows: In order to be actionable, the language complained of must tend to lower the plaintiff in the esteem of any substantial and respectable group, even though it may be quite a small minority. The defamatory meaning must be one that could be ascribed to the words by hearers of common and reasonable understanding. . -12- 12 . . The threshold question . . . is whether the published words are capable of conveying the defamatory meaning or innuendo ascribed to them by the plaintiff. Thomson v. Cash, 402 A.2d 651, 653 (N.H. 1979) (internal ________________ quotation marks and citations omitted). We agree with the district court (and the Aversas do not contest) that the claims for intentional infliction of emotional distress and loss of consortium through "verbal abuse and slander" also "arose out of" slander within the meaning of 28 U.S.C.  2680(h). See Jiminez-Nieves v. United States, 682 F.2d 1, 6 ___ _______________________________ (1st Cir. 1982) (court must look beyond the literal language to ascertain the real cause of the complaint; heartland of the tort of defamation is injury to reputation by the implicit or explicit communication of an idea).  1. The Westfall Act 1. The Westfall Act Before 1988, a plaintiff with a tort claim against a federal employee could proceed against the employee in his or her personal capacity, and if the employee was "acting within the scope of his office or employment," 28 U.S.C.  1346(b), could proceed against the United States, instead of or in addition to the federal employee, under the Federal Tort Claims Act (FTCA), 28 U.S.C. 1346, 2671-78, 2680. Congress, however, expressly excepted certain kinds of claims from the FTCA's otherwise broad waiver of sovereign immunity, including any claim arising out of slander and other -13- 13 specified intentional torts. 28 U.S.C. 2680(h).6 Thus, while a plaintiff with a claim not excepted from the right to sue the United States likely would choose to sue the government rather than or in addition to an individual who may be judgment-proof, a plaintiff with an excepted claim like the Aversas' would have no choice but to proceed solely against the employee. The employee, however, might be found absolutely immune from suit according to federal common law principles. See Howard v. Lyons, 360 U.S. 593, 597 (1959). ___ _______________ In 1988, the Supreme Court decided Westfall v. ____________ Erwin, 484 U.S. 292 (1988), holding that absolute immunity _____ from state-law tort actions was available to federal employees only when their conduct was both "within the scope of their official duties and . . . discretionary in nature." ___ Id. at 297-98 (emphasis in original). The Court, however, __ invited Congress to legislate standards defining the scope of  ____________________ 6. The legislative history regarding the intentional tort exceptions is scant, but they appear to rest on concerns raised by the Department of Justice that those torts would be "easily exaggerated" and "difficult to make a defense against." See 2 L. Jayson, Personal Injury, Handling Federal ___ Tort Claims 13.06[1][a], at 13-48-49 n. 1.2 (1995) (discussing legislative history). In 1973, Congress removed from the list assault, battery, false imprisonment, false arrest, abuse of process and malicious prosecution committed by investigative or law enforcement officers, in recognition of the "manifest injustice" of denying a federal remedy when a federal agent intentionally assaults a citizen in an illegal raid, while providing the remedy to a citizen run down by a negligent mail truck driver. See S. Rep. No. 93- ___ 588, 93d Cong., 2d Sess. 1974, reprinted in 1974 U.S.C.C.A.N. _________ __ 2789. Congress has not otherwise amended the exceptions for intentional torts.  -14- 14 federal employee immunity, since it was in the best position to resolve the "complex and often highly empirical inquiry" whether the "contribution to effective government" sufficiently "outweighs the potential harm to individual citizens" to warrant immunity in a particular context. Id. __ at 299-300.  Congress responded within the year with the Federal Employees Liability Reform and Tort Compensation Act of 1988, commonly known as the Westfall Act. The Westfall Act amended the FTCA to make an action against the United States the exclusive remedy for money damages for injury arising from the "negligent or wrongful act or omission" of a federal employee "acting within the scope of his office or employment," 28 U.S.C. 2679(b)(1), thus eliminating the discretionary function requirement and making federal employees absolutely immune from suit for torts committed within the scope of employment.7 The FTCA is the exclusive remedy even when, as here, an exception to the FTCA precludes  ____________________ 7. Congress understood prior immunity law as not requiring the act to have been discretionary in nature, feared protracted litigation in determining whether the employee exercised governmental discretion, and intended "to return Federal employees to the status they held prior to the Westfall decision." See H.R. Rep. No. 100-700, 100th Cong., ________ ___ 2d Sess. 4,reprinted in 1988 U.S.C.C.A.N. 5945, at 5946-47.  _________ __ -15- 15 government liability. United States v. Smith, 499 U.S. 160, _______________________ 165-67 (1991).8 The exclusive remedy provision is first invoked through a certification by the Attorney General or her delegate that the employee was acting within the scope of employment.9 28 U.S.C. 2679(d)(1). Once the certification is made, the suit is "deemed an action against the United States" under the FTCA and the United States is substituted as the party defendant, id., but the certification is __ provisional and subject to judicial review, after which the employee may be resubstituted. Gutierrez de Martinez v. __________________________ Lamagno, 115 S. Ct. 2227, 2230-31 (1995).  _______ 2. State Respondeat Superior Law  2. State Respondeat Superior Law __________ ________ Before the Westfall Act, federal employee immunity from suit for state law torts was decided according to federal common law. The Westfall Act provides that a federal  ____________________ 8. The Act provides that once the United States has been substituted as the party defendant, the action "shall be subject to the limitations and exceptions applicable to . . . any action against the United States filed pursuant to section 1346(b)," 28 U.S.C. 2679(d)(4) (sentence structure disregarded), and the legislative history states that "any claim against the government that is precluded by the exceptions set forth in Section 2680 of Title 28, U.S.C. also is precluded against an employee in [sic] his or her estate." H.R. Rep. No. 100-700, supra, at 5950.  _____ 9. The Attorney General has delegated her authority to make scope of employment certifications to the United States Attorneys with respect to civil actions brought against federal employees in their respective districts, subject to the supervision of the Assistant Attorney General in charge of the Civil Division. See 28 C.F.R. 15.3(a).  ___ -16- 16 employee is immune if he or she acted "within the scope of his office or employment," 28 U.S.C. 2679(b)(1), which, according to the legislative history, is to be determined by the same law that had previously been used only to determine whether the United States could be sued under the FTCA: the law of respondeat superior of the state in which the incident __________ ________ occurred. See H.R. Rep. No. 100-700, supra, at 5949. ___ _____ At oral argument, we raised a concern about whether certain comments in the recent case of Gutierrez de Martinez _____________________ v. Lamagno, supra, might indicate that scope of employment is __________ _____ to be determined according to federal common law rather than state respondeat superior law. In that case, the Court __________ ________ concluded that a certification by the Attorney General or her delegate that the federal employee was acting within the scope of his or her employment is subject to judicial review for purposes of permanently substituting the United States as the party defendant. 115 S. Ct. at 2234-36. Amicus raised a potential Article III problem -- that if the court concluded that the employee acted outside the scope of employment, and the plaintiff and defendant were not of diverse citizenship, there would no longer be a federal question to support subject matter jurisdiction once the federal employee was resubstituted. Id. at 2236. A four-justice plurality __ concluded that Article III nonetheless was satisfied because "there was a nonfrivolous federal question" presented at the ___ -17- 17 outset of the case. Id. at 2236 (emphasis in original). __ Justice Ginsburg wrote:  At that time, the United States was the defendant, and the action was thus under the FTCA. Whether the employee was acting within the scope of his federal employment is a significant federal question -- and the Westfall Act was designed to assure that this question could be aired in a federal forum. Because a case under the Westfall Act thus "raises [a] questio[n] of substantive federal law at the very outset," it "clearly 'arises under' federal law, as that term is used in Art. III." Id. at 2236 (citations omitted).  __ After further briefing in which both parties agreed that the plurality did not mean that the scope determination should be resolved by reference to federal rather than state law, we reach the same conclusion. First, we think that all the plurality intended to address was whether there is a sufficient federal predicate to keep a Westfall Act case in federal court, once a determination has been made that the defendant was not acting within the scope of his federal employment. The answer was yes, because at the outset, the case arose under a law of the United States (the FTCA), and the United States was a party. See U.S. Const. art. III,  ___ 2. Second, even if Justice Ginsburg was referring in some measure to the scope determination, federal law does determine whether a person is a federal employee and the nature and contours of his or her federal responsibilities. -18- 18 See Ezekiel v. Michel, 66 F.3d 894, 899 (7th Cir. 1995); ___ __________________ Platis v. United States, 409 F.2d 1009, 1011 (10th Cir. _________________________ 1969). But state law governs whether the person was acting within the scope of that employment and those responsibilities. As already noted, the legislative history is clear that Congress so intended, H.R. Rep. No. 100-700, supra, at 5949, and although we are the first to grapple with _____ the meaning of the plurality's remarks in Gutierrez de _____________ Martinez, the courts of appeal, including our own, have ________ concluded that state law controls. See Heuton v. Anderson, ___ ___________________ 75 F.3d 357, 360 (8th Cir. 1996); Haddon v. United States, 68 _______________________ F.3d 1420 (D.C. Cir. 1995); Garcia v. United States, 62 F.3d _______________________ 126, 127 (5th Cir. 1995); Jamison v. Wiley, 14 F.3d 222, 227 ________________ n.4 (4th Cir. 1994); Schrob v. Catterson, 967 F.2d 929, 934 ___________________ (3d Cir. 1992); McHugh v. Univ. of Vermont, 966 F.2d 67 (2d ___________________________ Cir. 1992); S.J. & W. Ranch, Inc. v. Lehtinen, 913 F.2d 1538, _________________________________ 1542 (11th Cir. 1990), cert. denied, 112 S. Ct. 62 (1991); ____ ______ Nasuti v. Scannell, 906 F.2d 802, 805 n.3 (1st Cir. 1990); ___________________ Arbour v. Jenkins, 903 F.2d 416, 421-22 (6th Cir. 1990); ___________________ Washington v. United States, 868 F.2d 332, 334 (9th Cir.), ____________________________ cert. denied, 493 U.S. 992 (1989). ____ ______ In a related vein, Aversa argues that we indicated in Nasuti v. Scannell, supra, that intentional torts are not __________________ _____ within the scope of employment as a matter of law. There, we stated that "the tort charged (assault and battery) is one of -19- 19 the 2680(h) exceptions which could not by definition be within the scope of employment." 906 F.2d at 813 n.16. This remark, however, does not mean that intentional torts excepted by section 2680(h) are outside the scope of employment as a matter of federal law regardless of the law of respondeat superior of the state in which the tort __________ ________ occurred. The assault at issue in Nasuti took place in ______ Massachusetts, under whose law an assault is within the scope of employment only if done in response to some conduct of the plaintiff that interfered at the time with the employee's ability to do his or her job. Id. at 805 n.3 (citing Miller __ ______ v. Federated Dep't Stores, Inc., 304 N.E.2d 573, 579 (Mass. ________________________________ 1973)). Because the district court found no evidence of those circumstances, the assault on Nasuti was outside the scope of employment as a matter of Massachusetts law. Generally, however, an intentional tort excepted by section 2680(h) can be within the scope of employment if state respondeat superior law so requires. See, e.g., Henson v. __________ ________ ___ ____ _________ NASA, 14 F.3d 1143, 1147-48 (6th Cir. 1994) (under Ohio law, ____ an employee's acts are within the scope of employment if he acts within his authority during the course of employment even though acting intentionally or maliciously, but are outside the scope if the acts are self-serving and in no way facilitate the employer's business); Nadler v. Mann, 951 F.2d ______________ 301, 305-06 (11th Cir. 1992) (under Florida law, prosecutor's -20- 20 allegedly slanderous conduct in referring bribery allegation to FBI was within scope of employment, but leaking the story to the press was not); Jayson, supra, 9.07[1], at 9-168 _____ (that the employee's conduct was intentional does not preclude a finding that he was acting within the scope of employment). 3. Scope of Employment 3. Scope of Employment We now turn to the merits. It is the plaintiff's burden to prove the existence of subject matter jurisdiction. Murphy v. United States, 45 F.3d 520, 522 (1st Cir.), cert. _______________________ ____ denied, 115 S. Ct. 2581 (1995). Because it is not in dispute ______ that Aversa cannot sue the United States for defamation, there is subject matter jurisdiction only if Walsh and/or Claunch acted outside the scope of his employment. It was Aversa's burden to persuade the court that they did. Nasuti, ______ 906 F.2d at 813 n. 16. In ruling on a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), the district court must construe the complaint liberally, treating all well-pleaded facts as true and indulging all reasonable inferences in favor of the plaintiff. Murphy, 45 F.3d at 522. In addition, the court ______ may consider whatever evidence has been submitted, such as the depositions and exhibits submitted in this case. Cf. __ Nasuti, 906 F.2d at 808 (trial court may hold evidentiary ______ hearing to resolve immunity-related factual disputes). We -21- 21 review the district court's scope of employment determination de novo.  __ ____ There is no New Hampshire case resolving a scope- of-employment question in a defamation case, but we find sufficient guidance in New Hampshire cases dealing with the question in the context of assault and in those sections of the Restatement (Second) of Agency that we feel confident the New Hampshire Supreme Court would follow. See Croes v. ___ _________ United States, 726 F.2d 31, 32 (1st Cir. 1984).  _____________ An act is within the scope of employment under New Hampshire law if it was authorized by the employer or incidental to authorized duties; if it was done within the time and space limits of the employment; and if it was actuated at least in part by a purpose to serve an objective of the employer. See Daigle v. City of Portsmouth, 534 A.2d ___ ____________________________ 689, 698-700, 701-02 (N.H. 1987); Richard v. Amoskeag Mfg. _________________________ Co., 109 A. 88, 91-92 (N.H. 1920); Restatement (Second) of ___ Agency 228(1) (1958). The conduct is not within the scope of employment if it was "different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master." Restatement, supra, 228(2).  _____ As there was no dispute that Walsh and Claunch acted within the time and space limits of their employment, the magistrate judge focused on whether their conduct was -22- 22 authorized or incidental to authorized duties, and was intended by them to serve their employers. He found that because Walsh and Claunch were authorized to prepare press releases and participate in press conferences in order to keep the public informed, and because Howard approved the press releases, made the decision to hold the press conferences, and was present for the press conferences, the statements were either authorized or incidental to authorized duties. The magistrate judge further found that Walsh and Claunch acted at least in part to serve their employers' interests in keeping the public informed of law enforcement efforts.  Aversa correctly argues that Walsh's defamatory statements to the press were not authorized. Walsh testified that as an Assistant United States Attorney, he was expected to abide by the United States Attorneys' Manual ("the Manual") issued by his employer, the Department of Justice. Chapter 7 of the Manual, entitled "Media Relations," provides that "fairness [and] accuracy . . . must prevail in all dealings with the news media." Manual, ch. 7, 1-7.001 (1988). News conferences should not be held to announce indictments or arrests except in "unusual circumstances," such as to alert the public about a fugitive from justice, and then "extreme care" should be taken to avoid statements branding an accused as guilty of a crime of which he or she -23- 23 has not been convicted. Id. Written news releases "relating __ the essentials of the indictment" may be distributed, and, with permission of the United States Attorney, an Assistant United States Attorney "may answer legitimate questions about indictments or arrests, either in press conferences or in discussions with individual reporters, but answers should not go beyond explanation of what is in the public document or the confines of 28 C.F.R. 50.2." Id. The Manual provides __ that 28 C.F.R. 50.2 "defines the types of information that may be and the types of information that may not be made ___ __ ___ ___ __ available to the news media about pending . . . criminal cases by employees of the Department of Justice." Id. __ (emphasis in original). Employees are to adhere to the regulation "in both letter and spirit." Id.  __ The regulation provides that, among other facts and circumstances not relevant here, Justice Department employees may make public the "substance or text of the charge, such as a[n] indictment," and may disclose "only incontrovertible, factual matters." 28 C.F.R. 50.2(b)(3). Release of information that would be prejudicial or would serve no law enforcement function is prohibited. Id. 50.2(b)(3), (5), __ (6). Statements which could "reasonably be expected to influence the outcome of a pending or future trial," and statements concerning evidence in the case, whether or not -24- 24 anticipated to be used at trial, are prohibited. Id. __ 50.2(b)(2), (6)(v).  Walsh also testified that he was subject to Rule 35 of the Local New Hampshire District Court Rules, which prohibits any lawyer from releasing information that is not a matter of public record, or is likely to interfere with a fair trial or otherwise prejudice the due administration of justice. See D.N.H. L.R. 35. ___ Walsh admitted that, in dealing with the news media regarding a criminal case, he was not authorized to say anything that was inaccurate or misleading, not contained in a public document, or prejudicial to a defendant's right to a fair trial, or to otherwise contravene the directives of the Manual, 28 C.F.R. 50.2, or Local Rule 35. The statements, as represented in the complaint and appearing in the press releases and news articles submitted to the court, transgressedthesepoliciesandrules andthereforewerenot authorized. That Howard approved the press releases, made the decision to call the press conferences, and was present at the press conferences does not change that result. Howard did not approve in advance any of Walsh's oral statements to the press.10 Moreover, we do not think that Howard's  ____________________ 10. Howard did approve Walsh's statements after the fact. Judge Loughlin required Howard's presence at the sentencing hearing and asked him to respond to his criticism of the "various innuendoes, totally false, in the media that these crimes were drug related." Howard stated that he "stood by -25- 25 approval can suffice as authorization for Walsh's defamatory statements. An employee of the Department of Justice who wishes to release information beyond that allowed by 28 C.F.R. 50.2 must obtain permission from the Attorney General or Deputy Attorney General, 28 C.F.R. 50.2(9), not the United States Attorney, and Walsh did not seek such approval.  Although an employee's intentionally tortious act was not authorized, it may nonetheless have been within the scope of employment if it was "incidental to authorized duties." According to New Hampshire cases deciding whether assaults were within the scope of employment, the conduct must meet three requirements in order to be considered incidental to authorized duties: (1) the employer authorized or could foresee that the employee would use a reasonable degree of force as a means of carrying out an authorized duty; (2) the employee used excessive force, although wrongly, as a means of accomplishing an authorized duty; and (3) the employee's purpose was, at least in part, to carry out an authorized duty. Daigle, 534 A.2d at 699-702; ______ Richard, 109 A. at 90-91; Rowell v. Boston & Maine R.R., 68 _______ ______________________________ N.H. 358, 359 (1895). See also Restatement, supra, 229 ___ ____ _____ cmt. b (even though an act is of an entirely different kind  ____________________ the actions and conduct of the Assistant United States Attorney in this case throughout." -26- 26 than that authorized, it may be "incidental to an authorized act" if it is "within the ultimate objective of the principal and an act which it is not unlikely that such a servant might do"). If these conditions are met, it follows that the employer is liable for the employee's negligent or willful use of excessive force although the employer did not authorize it and even forbade it. See Daigle, 534 A.2d at ___ ______ 699-700 (police officer's use of excessive force in effecting arrest was within scope of employment); Richard, 109 A. at _______ 91-92 (supervisor's use of excessive force in keeping employee at her work station was within scope of employment); Rowell, 68 N.H. at 359 (conductor's use of excessive force in ______ ejecting plaintiff from railroad car was within scope of employment). If any one of the conditions is not met, the employee's conduct is outside the scope of employment. Morin _____ v. People's Wet Wash Laundry Co., 156 A. 499, 500 (N.H. 1931) ________________________________ (although employee's motive in assaulting plaintiff may have been to serve his employer, assault was outside scope of employment because the employment implied no measure of force).  Here, the Justice Department authorized or at least could foresee that an Assistant United States Attorney permitted to inform the public about arrests, indictments and convictions would convey to the public a reasonable amount of __________ negative information about the persons involved. Further, -27- 27 although unfortunate, we think that the Department of Justice reasonably could anticipate that an employee entrusted with that power might abuse it. Analogously, the Daigle court ______ stated that "excessive force in the use of guns and nightsticks is always foreseeable." 534 A.2d at 700. True, there were policies and regulations against the kinds of statements that were made, but an act which is forbidden or done in a forbidden manner may nonetheless be within the scope of employment. Restatement, supra, 230. A "master _____ cannot direct a servant to accomplish a result and anticipate that he will always use the means which he directs or will refrain from acts which it is natural to expect that servants may do." Id., 230 cmt. b. See also Danforth v. Fisher, 75 __ ___ ____ __________________ N.H. 111, 111-12 (1908) (if employee was serving some purpose of his employer, it is immaterial that he did it in a way that was unexpected). We also think that Walsh made the alleged statements as a means, albeit tortious and contrary to his employer's policies and rules, of accomplishing the Justice Department's objective of informing the public of recent law enforcement efforts. To be sure, Walsh's suggestions that Aversa was involved in drug trafficking, tax evasion and racketeering furthered no legitimate law enforcement objective and actually misinformed the public. But his statements did inform the public about a recent prosecution -28- 28 under the anti-structuring laws. The New Hampshire Supreme Court agrees with the Restatement's view that "the criminal or tortious character of an employee's act does not, ipso ____ facto, remove the act from the scope of employment," Daigle, _____ ______ 534 A.2d at 700 (citing Restatement, supra, 231), so long _____ as it is "exerted in, and for the purpose of, doing the employer's business." Id. And that court does not __ necessarily agree with the Restatement's view that, if these conditions are met, the degree of outrageousness of the conduct may remove it from the scope of employment. Id. __ (referring to Restatement, supra, 229 cmt. b); Rowell, 68 _____ ______ N.H. at 359 (master is responsible for the acts of the servant done as a means and for the purpose of performing that work although done with a wanton or reckless purpose to accomplish the work in an unlawful manner); Arthur v. Balch, ________________ 23 N.H. 157, 161 (1851) (employee acted within the scope of his employment when he used a horse he had stolen to do his employer's business).  Finally, we think that Walsh's statements were actuated, at least in part, by an intention to serve his employer. Daigle, 534 A.2d at 699; Restatement, supra,  ______ _____ 228(1)(c). This inquiry focuses on the subjective intent of the employee and his notion of how to serve his employer's interests need not be reasonable or reflective of good -29- 29 judgment.11 Aversa points out that the complaint, which the district court was required to take as true, alleged that Walsh defamed Aversa for the purpose of promoting his own career, and that Judge Loughlin found at least some of Walsh's statements to have been "self-serving." The complaint, however, also alleged that Walsh told Aversa's attorney that he planned to use the case to "set a precedent" and "educate the public" about the currency transaction reporting requirements. During his deposition, Walsh did not deny that the media accurately reported his words and testified that he believed he was discharging his duty to inform the public in making these statements. From this, the district court justifiably could find that Walsh intended, at least in part and although misguidedly, to serve an objective of his employer. Under these circumstances, we have little doubt that the New Hampshire Supreme Court would hold Walsh's employer responsible for his defamatory statements. We find further support for this conclusion in the Restatement's  ____________________ 11. In Daigle, the New Hampshire Supreme Court found that ______ the police officer was actuated at least in part to serve a law enforcement function in that he believed it was appropriate to beat suspects in the course of serving the law enforcement objectives of capturing the guilty and establishing their guilt. 534 A.2d at 700. See also Concord ___ ____ _______ Bank v. Greg, 14 N.H. 331, 340 (1843) (principal is ______________ chargeable with agent's fraudulent acts done for the purpose of effecting sale for principal; "[w]ere it otherwise, the principal would never be liable for the frauds of a special agent, unless he commissioned him to commit a fraud"). -30- 30 special rule for defamation, which embodies the general principle, recognized in the New Hampshire assault cases, that an employer should be held responsible when it entrusts an employee with a duty particularly susceptible of abuse to cause harm:  A master is subject to liability for defamatory statements made by a servant acting within the scope of his employment . . . . If the scope of employment of a servant includes the making of statements concerning others which he believes to be true and privileged, the master is subject to liability for untrue and unprivileged defamatory statements made by the servant concerning such others, if the statements are otherwise within the scope of the servant's employment. . . . If the master employs a servant to speak for him, he is subject to liability if the servant makes a mistake as to the truth of the words spoken or as to the justification for speaking them, or even if he speaks with an improper motive, provided that he acts at least in part to serve his employer's purposes. The master may be liable even though the servant knows the statement to be untrue, as where the manager of a store, for the purpose of obtaining an admission from a suspected thief, charges such person with other similar crimes, although having no belief in his own statements.  Id., 247 & cmts. a, c. __ We also conclude that the district court correctly held that Claunch acted within the scope of his employment. One of his duties was to inform the public about tax and other cases in which the IRS was involved in order to deter violations of the law and to instill public confidence that -31- 31 the IRS prosecuted violators. The IRS's policy statement on news coverage required Claunch to act with due regard for an individual's right to a fair trial and the public's right to know, and, particularly in view of the "statutory prohibition on the disclosure of tax information," to strictly limit what he said to facts that were a matter of public record. IRS Policy Statement P-1-181. Aversa alleged that Claunch stated that the case represented the IRS's commitment to ferreting out, investigating and prosecuting money launderers. Aversa was indicted for and convicted of violating the anti- structuring law, which was enacted as part of the "Money Laundering Control Act of 1986." See Pub. L. No. 99-570, ___ Subtitle H, 100 Stat. 3207-18 (Oct. 27, 1986). The legislative history, however, defines "money laundering" essentially as concealing money from the government (not one's spouse) for the purpose of covering up illegal activity or evading taxes. See H.R. Rep. No. 746, 99th Cong., 2d ___ Sess., p. 16 (1986). Aversa was not, therefore, a "money launderer." Nonetheless, we have no doubt that Claunch's employer would be held responsible for his statement under the principles of New Hampshire law set forth above. Because Walsh and Claunch acted within the scope of their employment, the United States was properly substituted as the party defendant, and the common law claims were properly dismissed pursuant to the exception to jurisdiction -32- 32 under the FTCA for claims arising from libel and slander. 28 U.S.C. 2680(h).  B. The Constitutional Claim B. The Constitutional Claim A person may sue a federal official in his or her individual capacity for damages arising out of a constitutional violation.12 See Bivens v. Six Unknown Named ___ ___________________________ Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971). _____________________________________ Relying on Bivens, the Aversas alleged in Count I of their ______ complaint that Walsh and Claunch deprived Aversa of a liberty interest guaranteed by the Due Process Clause of the Fifth Amendment by making false and misleading statements to the press with willful or reckless disregard of his rights, thus causing his employer to discharge him from his job as an accountant, preventing him from finding other employment as an accountant, and damaging his business goodwill.13   ____________________ 12. Constitutional tort claims are not subject to the Westfall Act's exclusive remedy provision. 28 U.S.C  2679(b)(2)(A). 13. Aversa contends that the district court erred in denying him leave to amend Count I to add: (1) that the defendants violated a federal statutory right by contravening Rule 35 of the Local New Hampshire District Court Rules, and (2) that Aversa permanently lost his right to earn a living as an accountant. Leave to amend "shall be freely given when justice so requires," Fed. R. Civ. P. 15, but need not be given if the amendment would not be "a proper subject of relief." Foman v. Davis, 371 U.S. 178, 182 (1962). As to ______________ the first proposed addition, a plaintiff may sue for violation of a federal statute under section 1983 or Bivens ______ if the statute "create[s] enforceable rights, privileges, or immunities," which, in turn, depends on whether the provision "was intend[ed] to benefit the putative plaintiff." Wilder ______ v. Virginia Hosp. Ass'n, 496 U.S. 498, 508 (1990) (internal ________________________ -33- 33 The district court granted summary judgment in favor of Walsh and Claunch, finding that they were qualifiedly immune from suit. Summary judgment is proper if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c). Because no material fact is in dispute, the question before us is one of pure law. Our review is de novo and we view the facts in the __ ____ light most favorable to Aversa. St. Hilaire v. City of ________________________ Laconia, 71 F.3d 20, 24 (1st Cir. 1995), cert. denied, 64 _______ ____ ______ U.S.L.W. 3849 (U.S. June 24, 1996). An official is qualifiedly immune if his "conduct [did] not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In ____________________  ____________________ quotation marks and citations omitted). Local Rule 35, entitled "Release of Information by Attorneys in Criminal Cases," limits the information that may be made public before and during a criminal trial, and can be said to be intended to protect a criminal defendant's right to a fair trial. We do not reach the question whether a civil cause of action could ever rest on Local Rule 35, because we do not think that Rule 35 was intended to protect against loss of employment or business goodwill. Thus, denial of the request to amend was not error. The answer to Aversa's complaint about the denial of his second proposed addition is that the court considered Aversa's allegations that he was fired from his job and lost future employment opportunities as an accountant and we consider them here.  -34- 34 finding that the right Aversa asserted was not clearly established, the district court not only relied on the law as it was in 1990, but on Siegert v. Gilley, 500 U.S. 226 __________________ (1991), which postdated the alleged violation. Qualified immunity, however, must be decided according to the law in effect at the time of the alleged violation -- "implicit in the Harlow formulation . . . is a temporal dimension: the ______ right must have been clearly established at the time of the defendants' alleged improper actions." Souza v. Pina, 53 ______________ F.3d 423, 425 (1st Cir. 1995). The court's reliance on Siegert in its qualified immunity analysis stemmed from some _______ confusing language in that very case: A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is "clearly established" at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all. Id. at 232. __ Siegert failed not only to allege a violation of a constitutional right that was clearly established at the time of Gilley's actions, but also to establish the violation of any constitutional right at all. Id. at 233. __ Some courts have read this language as requiring a resolution of the merits under current law before beginning the analysis of the law as it stood at the time of the alleged violation. See DiMeglio v. Haines, 45 F.3d 790, 795- ___ __________________ 97 (4th Cir. 1995) (discussing various interpretations of -35- 35 Siegert). But we think that these statements, read in _______ context, simply mean that the plaintiff must assert a clearly established federal constitutional (or statutory) right, and not merely a state law tort claim. The Siegert Court _______ concluded that the damage Siegert alleged "may be recoverable under state tort law but it is not recoverable in a Bivens ______ action," Siegert, 500 U.S. at 234, and held that he had _______ "failed to satisfy the first inquiry in the examination of such a claim; he failed to allege the violation of a clearly established constitutional right." Id. at 231.  __ This is not to say that currently applicable law cannot be considered in the course of, in addition to, or instead of determining the law in effect at the time of the alleged violation. See Harlow, 457 U.S. at 818 ("On summary ___ ______ judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred."). For example, a court of appeals may recognize a right for the first time in that circuit, but find that it was not clearly established at the time of the alleged violation. See Calhoun v. New ___ ______________ York State Div. of Parole Officers, 999 F.2d 647, 655 (2d ____________________________________ Cir. 1993). Or a court may look to current Supreme Court law to determine that, although the right may now exist, it was not clearly established before. See St. Hilaire, 71 F.3d at ___ ___________ 27-28. A court may also bypass the qualified immunity -36- 36 analysis if it would be futile because current law forecloses the claim on the merits. See Hinton v. City of Elwood, 997 ___ _________________________ F.2d 774, 779-80 (10th Cir. 1993). We follow the latter course in this case because Aversa failed to state a claim under current law.  Aversa claimed that Walsh and Claunch deprived him of his right to liberty under the substantive component of the Due Process Clause of the Fifth Amendment, which protects against "certain government actions regardless of the fairness of the procedures used to implement them." Daniels _______ v. Williams, 474 U.S. 327, 331 (1986). See also Pittsley v. ___________ ___ ____ ___________ Warish, 927 F.2d 3, 6 (1st Cir.), cert. denied, 502 U.S. 879 ______ ____ ______ (1991).14 We have said that substantive due process is violated if either (1) the government actor deprived the plaintiff of an identified interest in life, liberty or property protected by the Fifth Amendment, or (2) the government actor's conduct "shocks the conscience." See ___ Brown v. Hot, Sexy and Safer Prods., Inc., 68 F.3d 525, 531 __________________________________________ (1st Cir. 1995) (citations omitted), cert. denied, 116 S. Ct. ____ ______ 1044 (1996). Because Aversa did not address the latter theory below or in his brief to this court, we limit our discussion to the former.   ____________________ 14. In contrast, the essence of a procedural due process claim is that a government actor deprived the plaintiff of life, liberty or property through procedures that were inadequate in light of the importance and characteristics of the affected interest. Pittsley, 927 F.2d at 6. ________ -37- 37 In Paul v. Davis, 424 U.S. 693 (1976), the Court ______________ indicated that a claim for defamation could rise to a constitutional level if accompanied by a loss of employment, but left unclear whether that loss would have to result from some further action by the defendant in addition to the defamation itself. In Siegert v. Gilley, the Court made __________________ clear that it would. Siegert resigned from his job as a psychologist at a federal hospital in order to avoid being terminated, then began working at an Army hospital. Because Army hospitals required "credentialing" by a committee, Siegert signed a request form asking the federal hospital to provide his new employer with information regarding his job performance and privileges. Gilley, Siegert's former supervisor, sent a letter in response, stating that he could not recommend Siegert for privileges as a psychologist, and that Siegert was inept, unethical and the most untrustworthy individual he had supervised in thirteen years. The committee denied Siegert credentials. Thereafter, Siegert was turned down for a position at another Army hospital and returned to work at the first Army hospital with provisional credentials. After his administrative appeals were denied, his federal employment was terminated altogether. Id. at __ 228-29. The Court found that Gilley's defamatory statements and their consequences were not actionable as a deprivation of liberty, stating: -38- 38 The alleged defamation was not uttered incident to the termination of Siegert's employment by the hospital, since he voluntarily resigned from his position at the hospital, and the letter was written several weeks later. The statements contained in the letter would undoubtedly damage the reputation of one in his position, and impair his future employment prospects. But the plaintiff in Paul v. Davis similarly alleged ________________ serious impairment of his future employment opportunities as well as other harm. Most defamation plaintiffs attempt to show some sort of damage and out-of- pocket loss which flows from the injury to their reputation. But so long as such damage flows from injury caused by the defendant to a plaintiff's reputation, it may be recoverable under state tort law but it is not recoverable in a Bivens ______ action.  Id. at 234. Thus, what may have been left open by Davis was __ _____ foreclosed by Siegert -- in order to state a cognizable claim _______ that defamation together with loss of employment worked a deprivation of a constitutionally-protected liberty interest, a plaintiff must allege that the loss of employment resulted from some further action by the defendant in addition to the defamation. Where it is the defendant who terminated the plaintiff, the further action is the termination. But where, as here, a third party discharges or refuses to hire the plaintiff solely as a result of the defendant's defamation, the plaintiffhas notdescribed a viableconstitutional claim.15  ____________________ 15. Aversa contends that even if the defamation was not uttered in conjunction with some other more direct action by Walsh or Claunch causing him to be discharged from his job, the defamatory statements stood in the midst of circumstances -39- 39 III. CONCLUSION III. CONCLUSION "Although '[s]tatements to the press may be an integral part of a prosecutor's job, and . . . may serve a vital public function,' that function is strictly limited by the prosecutor's overarching duty to do justice." Souza, 53 _____ F.3d at 427. Those who wield the power to make public statements about criminal cases must "be guided solely by their sense of public responsibility for the attainment of justice." Id. (quoting Young v. United States ex rel. __ __________________________________ Vuitton et Fils S.A., 481 U.S. 787, 814 (1987)). The public _____________________ statements asserted to have been made in the course of Aversa's criminal case have been condemned as false, misleading, self-serving, unjust and unprofessional by every court to look at them.16  We therefore refer the matter of Assistant United States Attorney Walsh's conduct to the Office of Professional Responsibility of the Department of Justice, and to the  ____________________ wherein the criminal charges never should have been brought. We previously have expressed doubt, without deciding, that "an alleged constitutional violation for which the defendant prosecutor enjoys absolute immunity [such as initiating criminal charges] can provide the 'plus' needed to satisfy the 'defamation-plus' test of Paul v. Davis." Celia v. ______________ ________ O'Malley, 918 F.2d 1017, 1021 (1st Cir. 1990). In any event, ________ Aversa did not present this theory to the district court and we decline to consider it. 16. The characterizations of the defendants' conduct are quotations from the various trial judges who have heard the proceedings in this and the underlying criminal cases. This court makes no findings itself as to the defendants' conduct, but acts on the basis of the record. -40- 40 Professional Conduct Committee of the New Hampshire Supreme Court. We refer the matter of Agent Claunch's conduct to the Inspector General of the Department of the Treasury. We also refer former United States Attorney Howard's conduct to the Professional Conduct Committee of the New Hampshire Supreme Court. We do not suggest in any way to the disciplinary bodies what action, if any, should be taken. No costs. -41- 41